Thomas M. Melsheimer
(*Pro Hac Vice*)
John C.C. Sanders, Jr.
(*Pro Hac Vice*)
Katrina G. Eash
(*Pro Hac Vice*)
J. Travis Underwood
(*Pro Hac Vice*)
**WINSTON & STRAWN LLP**
2121 N. Pearl St., Suite 900
Dallas, TX 75201
Phone: 214-453-6500
Fax: 214-453-6400
tmelsheimer@winston.com
jsanders@winston.com
keash@winston.com

Robert S. Clark (Utah Bar No. 4015)
Jeffrey J. Hunt (Utah Bar No. 5855)
David C. Reymann (Utah Bar No. 8495)
Bryan S. Johansen (Utah Bar No. 9912)
**PARR BROWN GEE & LOVELESS**
101 S 200 E Ste 700
Salt Lake City, UT 84111
Phone: 801- 532-7840
Fax: 801-532-7750
rclark@parrbrown.com
jhunt@parrbrown.com
dreymann@parrbrown.com
bjohansen@parrbrown.com

*Counsel for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| LINDSAY PENHALL, on behalf of herself and all others similarly situated,<br><br>          Plaintiff,<br><br>v.<br><br>YOUNG LIVING ESSENTIAL OILS, LC,<br><br>          Defendant. | **DEFENDANT'S MOTION TO DISMISS OR STAY AND COMPEL ARBITRATION**<br><br>(ORAL ARGUMENT REQUESTED)<br><br>Case No. 2:20-cv-00617-DB<br><br>Judge Dee Benson |

## TABLE OF CONTENTS

I.     FACTS AND PROCEDURAL HISTORY ................................................................. 1

     a.    Plaintiff Agreed to a Valid and Enforceable Arbitration Provision .........................1

          i.    Penhall Agreed to the Original Agreement.....................................................1

          ii.    Penhall Agreed to the Amended Agreement ..................................................2

          iii.    Penhall Agreed to Retroactive Arbitration ....................................................3

     b.    Penhall Breached the Arbitration Provisions Because the Asserted Claims Relate to the Agreement and Thus Fall Within The Arbitration Provision..............4

     c.    This Court Can Enforce the Parties' Amended Agreement .....................................7

II.    LEGAL STANDARDS ................................................................................................. 8

     a.    The FAA's Strong Policy in Favor of Arbitration ..................................................8

     b.    The Existence of an Agreement to Arbitrate ..........................................................8

     c.    Delegation of Authority to Decide Arbitrability ..................................................10

     d.    Dismissal in Favor of Arbitration is Appropriate................................................10

III.   ARGUMENT .............................................................................................................. 10

     a.    Penhall Entered into a Valid and Enforceable Arbitration Agreement That Applies to Her Claims .........................................................................................10

     b.    The Arbitration Agreement Delegates Authority to the Arbitrator to Determine Arbitrability .......................................................................................13

IV.   CONCLUSION.......................................................................................................... 14

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                      **Page(s)**

*Aero Tech Aviation Design, LLC v. Otto Aviation Grp, LLC*,
   2017 WL 1397545 (D. Kan. April 18, 2017)..........................................................................8

*Allen v. Bissinger & Co.*,
   219 P. 539 (Utah 1923)..................................................................................................12

*Armijo v. Prudential Ins. Co. of Am.*,
   72 F.3d 793 (10th Cir. 1995) ......................................................................................8, 10

*Baugh v. Allied Prof'lss Ins. Co.*,
   2019 WL 1358855 (D. Utah Mar. 26, 2019) ..................................................................10

*Belnap v. Iasis Healthcare*,
   844 F.3d 1272 (10th Cir. 2017) ...............................................................................10, 13

*Born v. Progrexion Teleservices, Inc.*,
   2020 WL 4674236 (D. Utah Aug. 11, 2020) ..................................................................10

*Cedar Surgery Center, L.L.C. v. Bonelli*,
   96 P.3d 911 (Utah 2004)..................................................................................................9

*Elliot Coal Min. Co., Inc. v. Director, Office of Workers' Compensation
   Programs*,
   17 F.3d 616 (3d Cir. 1994)...............................................................................................6

*Elsken v. Network Multi-Family Sec. Corp.*,
   49 F.3d 1470 (10th Cir. 1995) ....................................................................................9, 11

*Fundamental Administrative Servs., LLC v. Patton*,
   504 Fed. App'x 694 (10th Cir. 2012) ..............................................................................8

*Hancock v. Am. Tel. and Tel. Co.*,
   701 F.3d 1248 (10th Cir. 2012) ..................................................................................9, 11

*Hugger-Mugger, L.L.C. v. Netsuite, Inc.*,
   2005 WL 2206128 (D. Utah Sept. 12, 2005)...............................................................9, 11

*Inception Mining, Inc. v. Danzig, Ltd.*,
   2018 WL 1940413 (D. Utah April 23, 2018).............................................................10, 13

*Morse v. ServiceMaster Global Holdings Inc.*,
   2012 WL 4755035 (N.D. Cal. Oct. 4, 2012)..............................................................12, 13

*Moses H. Crone Memorial Hosp. v. Mercury Constr. Corp.*,
    460 U.S. 1 (1983) ........................................................................................................8

*Nazaruk v. eBay, Inc.*,
    2006 WL 2666429 (D. Utah Sept. 14, 2006) ...................................................9, 11

*North Valley Emergency Specialists, L.L.C. v. Santana*,
    93 P.3d 501 (Ariz. 2004) ...........................................................................................6

*O'Shaughnessy v. Young Living Essential Oils, LC, et al.*,
    No. 19-51169 (April 28, 2020) ..................................................................................2

*P & P Indus., Inc. v. Sutter Corp.*,
    179 F.3d 861 (10th Cir. 1999) ..................................................................................5

*Payless Shoesource, Inc. v. Travelers Co., Inc.*,
    585 F.3d 1366 (10th Cir. 2009) ................................................................................6

*Rojas v. GoSmith, Inc.*,
    2020 WL 831585 (N.D. Ind. Feb. 20, 2020) .........................................................11

*Semenov v. Hill*,
    982 P.2d 578 (Utah. App. 1999) ...............................................................................9

*In re Universal Service Fund Telephone Billing Practices Litigation*,
    300 F. Supp. 2d 1107 (D. Kan. 2003) ....................................................................12

*Vernon v. Qwest Communications Int'l, Inc.*,
    857 F. Supp. 2d 1135 (D. Colo. 2012) ...................................................................12

*Warrior Energy Servs. Corp. v. Last Run, LLC*,
    2010 WL 4963028 (W.D. Okla. Dec. 1, 2010) ......................................................12

*Zink v. Merrill Lynch Pierce Fenner & Smith, Inc.*,
    13 F.3d 330 (10th Cir. 1993) ..................................................................................12

**Statutes**

9 U.S.C. § 2 ........................................................................................................................12

**Rules**

JAMS Rule 8(c) ..................................................................................................................13

**Other Authorities**

18 Williston on Contracts § 4:1 (4th ed. 2020)................................................................................12

Plaintiff Lindsay Penhall ("Penhall" or "Plaintiff") was a Young Living Member from May 2018 to November 2019, when inactivity caused her account to go dormant.  A month later, she filed the present lawsuit.  In her First Amended Complaint, Penhall alleges Young Living is a pyramid scheme which offers illegitimate and worthless products.  But Penhall's position in this lawsuit conflicts with her recent actions.  In March of this year, nearly three months after initiating this litigation, Penhall reactivated her Young Living account and purchased more than $120 worth of additional products from Young Living.  As part of the reactivation process, Penhall repeatedly, explicitly, and affirmatively assented to an agreement which required her to arbitrate all disputes— including the present one—arising out of or relating to her agreement with Young Living.  It is this unambiguous agreement Young Living is now seeking to enforce.

The Court should grant Young Living's Motion to Compel Arbitration; it should dismiss the claims under Rule 12(b)(6) or, in the alternative, stay the present proceedings; and it should compel the parties to arbitrate the claims Penhall asserts here.

## I.     FACTS AND PROCEDURAL HISTORY

### a.   <u>Plaintiff Agreed to a Valid and Enforceable Arbitration Provision</u>

Young Living is a globally recognized company incorporated and headquartered in Utah. Young Living creates and manufactures essential oils and wellness solutions and, through its Members, sells those solutions to millions of customers around the world.  Young Living is not a pyramid scheme, and Young Living will prove as such if and when necessary.

#### i.   *Penhall Agreed to the Original Agreement*

Penhall became a Young Living Member on May 24, 2018.  Dkt. No. 11-2 ("Penhall Declaration") at ¶ 2; Ex. 1 ("First Barrow Declaration") at ¶ 8.  At that time, she was required to,

and did, agree to the Young Living Member Agreement, the Young Living Policies and Procedures ("P&Ps"), and the Young Living Compensation Plan.  Ex. 1 at ¶¶ 4, 8.  By definition, these documents constitute a single "Agreement," and this specific iteration of the Agreement is referred to herein as the "Original Agreement."  *See* Ex. 3 at § "Policies and Procedures & Compensation Plan" ("the Policies and Procedures and the Compensation Plan . . . are incorporated into and made a part of this Member Agreement (collectively referred to as the 'Agreement')").

The Original Agreement included a "Jurisdiction and Choice of Law" section stipulating that "[a]ny legal action concerning the Agreement will be brought in the state and federal courts located in Salt Lake City, Utah."  *Id.* at § 9.  It also contained a mandatory arbitration clause which provided that "any controversy or claim arising out of or relating to the Agreement, or the breach thereof, will be settled by arbitration."  Ex. 4 at § 13.2.2.  The Fifth Circuit found a conflict in these provisions that rendered the arbitration clause unenforceable.  *See O'Shaughnessy v. Young Living Essential Oils, LC, et al.*, No. 19-51169 (April 28, 2020).

### ii.   *Penhall Agreed to the Amended Agreement*

In November 2019 Penhall's membership with Young Living was terminated through her inactivity.  Ex. 1 at ¶ 10.  On March 3, 2020, however, Penhall decided to reactivate her account by logging in with the user identification and password associated with her account.  Ex. 1 at ¶ 11; Ex. 10 ("Second Barrow Declaration"); Ex. 11[1]; Ex. 12.  Importantly, to reactivate her account Penhall was required to agree to Young Living's "Amended Agreement," which cures the alleged irreconcilable conflict the Fifth Circuit identified in the Original Agreement.  The Amended

---

[1] Exhibits 11 through 27 are true and correct copies of screenshots taken from the video feed of Ms. Penhall's March 3, 2020 virtual office session on Young Living's website.  Ex. 11 at ¶ 6.

Agreement includes (1) Young Living's updated P&Ps, (2) Young Living's updated Member Agreement, and (3) Young Living's updated Compensation Plan, all of which went into effect on January 1, 2020 and remained in effect on March 3, 2020.  Ex. 1 at ¶¶ 13–15.

Penhall's conduct leaves no doubt that she specifically intended to assent to the Amended Agreement.  After attempting to log-in on March 3rd and agreeing to reactivate her Membership, Penhall was next presented with Young Living's "Terms and Conditions," which included five hyperlinks to Young Living's Policies & Procedures, Compensation Plan, Terms and Conditions of the Compensation Plan, Privacy Policy, and Member Agreement.  Ex. 1 at ¶¶ 11–12; Ex. 13. Below these hyperlinks was a check box with the following text: "By clicking this box, I agree to these statements and to be bound by the terms and conditions of the Agreement…"  Ex. 1 at ¶ 16; Ex. 13.  Penhall affirmed her assent to the Amended Agreement by clicking the box, and went on to confirm her agreement again by clicking a button labelled "Agree and Continue" before placing an order for Young Living products.  Ex. 1 at ¶ 17; Ex. 14.  Lest there be any doubt, Penhall affirmed her assent again when she indicated that by placing her order she "agree[d] to Young Living's Policies and Procedures."  *Id.*; Exs. 15-19.  To ensure Penhall had every opportunity to review the documents she was agreeing to, the words "Young Living's Policies and Procedures" contained an active hyperlink to the operative document.  *Id.*  Not only ***could*** she have clicked on and reviewed the Amended Agreement, Penhall affirmatively represented that she ***had done so*** and that she agreed to be bound by its terms.  *See* Exs. 13-14.

### iii.   Penhall Agreed to Retroactive Arbitration

The Amended Agreement "supersedes all prior agreements" between Penhall and Young Living, and it corrects the inconsistencies—to the extent there were any—identified by the Fifth

Circuit.  Ex. 8 ("Updated Member Agreement") at § 13.  Specifically, it removes any potential conflict between the jurisdiction, venue, and arbitration clauses, and clearly provides that "any controversy or claim arising out of or relating to the Agreement, or the breach thereof, will be settled by arbitration."  Ex. 7 ("Updated P&Ps") at § 13.2.2.  The Amended Agreement also states the JAMS rules and procedures apply to any arbitration proceedings between the parties, providing "[t]he arbitration will be filed with, and administered by, Judicial Arbitration and Mediation Services ('JAMS') under its rules and procedures."  *Id.*  Under the Amended Agreement, it is only claims "not subject to arbitration" that are carved out and must be brought in the state or federal courts of Salt Lake City.  *Id.* at § 13.3.

The Amended Agreement's arbitration provision also contains an express exception to the Amended Agreement's general policy that "Amendments will not apply retroactively to conduct that occurred prior to the effective date of the amendment."  *Id.* at § 1.4.  Not only is the arbitration provision contained in "a separate and distinct agreement that is severable from the remainder of the Agreement," it also explicitly applies retroactively when the Amended Agreement is expressly accepted by a Young Living member, as is the case here.  *Id.* at § 13.2 ("Amendments will not apply retroactively to conduct that occurred prior to the effective date of the amendment *unless* expressly accepted by the member.") (emphasis added).

### b.  Penhall Breached the Arbitration Provisions Because the Asserted Claims Relate to the Agreement and Thus Fall Within The Arbitration Provision

In violation of both the Original Agreement and the Amended Agreement, Penhall initiated and maintained this litigation, which asserts claims arising out of or related to the Original and Amended Agreements.  Specifically, Penhall alleges Young Living's business operations, which are governed by the Original and Amended Agreements, constitute a pyramid scheme.  Indeed,

throughout the Amended Complaint, Plaintiff cites to, and relies on, the provisions of the Original

and Amended Agreements to provide alleged factual allegations supporting her claims:

- "The complex and intentionally hard-to-understand multi-layer **compensation/participation structure** of Young Living is a hallmark of illegal MLM pyramid schemes." Dkt. No. 4 at ¶ 24 (emphasis added).

- "For example, a legal MLM program must **structure its compensation** so that the distributors are paid primarily based on sales of goods and/or services to those outside of the plan. By contrast, an illegal pyramid scheme overwhelmingly rewards its participants for recruiting new distributors rather than through product sales made to persons outside the **pyramid structure**." Dkt. No. 4 at ¶ 25 (emphasis added).

- "The Young Living **compensation plan** rewards the recruitment of new distributors far more than the sale of product outside the pyramid." Dkt. No. 4 at ¶ 39 (emphasis added).

- "Young Living actually requires its distributors to further its deception. Specifically, Young Living requires that '[t]o qualify for compensation **under Young Living's Compensation Plan** . . . . [distributors] have the responsibility to promote Young Living products and the Young Living business opportunity." Dkt. No. 4 at ¶ 61 (citing to Young Living's P&Ps) (emphasis added).

Each and every one of Penhall's six claims relies on, and incorporates, Penhall's pyramid

scheme allegations, like the above. *See* Dkt. No. 4 at Counts I–VI.[2]  As a result, Penhall's claims

fall within the "broad" clause requiring arbitration of all claims "relating to the Agreement."  Ex.

7 at § 13.2.2; *P & P Indus., Inc. v. Sutter Corp.*, 179 F.3d 861, 871 (10th Cir. 1999) (observing

that arbitration clauses applying to claims "arising out of or relating to [the applicable agreement]"

are "not limited to question of contractual interpretation" and, accordingly, are "broad").

---

[2] Specifically, Penhall alleges (I) that Young Living operated its business as an "endless chain scheme," (II) that Young Living engaged in deceptive business practices by operating a pyramid scheme or "endless chain scheme," (III) that Young Living engaged in deceptive advertising practices by failing to disclose it operated an illegal pyramid scheme, (IV–V) that Young Living made fraudulent and negligent misrepresentations that it was operating an illegal pyramid scheme, and (VI) that Young Living unjustly received benefits from distributors pursuant to the Agreement. Dkt. No. 4 at Counts I–VI.

Additionally, the fact that the arbitration provision contains a carve-out for the protection of intellectual property rights and the enforcement of the non-solicitation and non-competition provisions in the Amended Agreement does not exempt Penhall's claims from mandatory arbitration. Ex. 7 at §§ 3.11.1, 13.2.2.[3]  Mistakenly, Penhall believes the "last antecedent rule"— a doctrine originating in the canons of statutory construction—demands a construction of Section 13.2.2 that would exempt this action from arbitration.  Dkt. No. 11 at 7 n.5.  According to Penhall, the phrase "available to safeguard and protect its intellectual property rights and/or to enforce its rights under the non-solicitation and non-competition provisions of this Agreement" only modifies the category "other relief" instead of every other form of relief enumerated in the preceding list. *Id.*  Under this interpretation, in any instance where a plaintiff seeks a writ of attachment, a temporary injunction, a preliminary injunction, or a permanent injunction—regardless of whether such relief is sought in connection with the enforcement of intellectual property, non-solicitation, or non-competition rights—arbitration is not mandated.

Not only is Penhall's interpretation simply wrong, it would reach an absurd result.  Here, the clause explaining the boundaries of the carve out comes "at the end of a list where modifiers meant to address all of the preceding items are often found."  *Payless Shoesource, Inc. v. Travelers Co., Inc.*, 585 F.3d 1366, 1370 (10th Cir. 2009).  Additionally, "the use of the word 'or' signals that the last antecedent rule was not meant to apply."  *North Valley Emergency Specialists, L.L.C. v. Santana*, 93 P.3d 501, 506 (Ariz. 2004); *see also Elliot Coal Min. Co., Inc. v. Director, Office*

---

[3]  Section 13.2.2 provides: "Notwithstanding the foregoing, nothing in these Policies and Procedures will prevent either party from applying to and obtaining from a court having jurisdiction, a writ of attachment, a temporary injunction, a preliminary injunction, a permanent injunction, or other relief available to safeguard and protect its intellectual property rights and/or to enforce its rights under the non-solicitation and non-competition provisions of this Agreement."

6

*of Workers' Compensation Programs*, 17 F.3d 616, 630 (3d Cir. 1994) (when earlier nouns in a list are separated from a "general term" at the end of the list "by a comma before the conjunction 'or'" it "suggests that the limiting clause applies to the entire series"). Thus, the doctrine does not apply here. Indeed, Penhall's interpretation would not only exempt all such claims from arbitration, it would mandate that the plaintiff requesting such relief ***would also be entitled to it***, regardless of the facts and circumstances giving rise to the claims. *See* Ex. 7 at § 13.2.2 ("nothing…will prevent either party from applying to ***and obtaining***…"). In other words, automatic injunctive relief—in any conceivable or theoretical factual scenario—is mandated under Penhall's view of the Agreement. This is an absurd interpretation contrary to the plain language of the Agreement.

c. <u>This Court Can Enforce the Parties' Amended Agreement</u>

Shortly after the filing of the suit, Young Living initiated an arbitration proceeding against Penhall in Utah, and separately filed a Motion to Dismiss Under Rule 12(b)(3) or Transfer Under § 1404(a) in the Southern District of California. *See* Dkt. No. 10. Because Penhall filed her suit in the wrong forum and the wrong tribunal (even if litigation in the courts were appropriate here, which it is not), Young Living was initially precluded from compelling arbitration in the contractually agreed-on forum (Utah) under Ninth Circuit law. *See* Dkt. No. 10 at 2 n.2. Thus, as a prerequisite, Young Living was forced to have the case transferred before it could seek to compel the benefit of its bargain: arbitration in Utah.

Interpreting the Original Agreement, the Southern District of California granted Young Living's motion to transfer. *See* Dkt. No. 36. However, the court observed that its "analysis would

7

not change under the updated Agreement and P&P." Dkt. No. 36-1 at 5 n.1.[4]  As explained herein, this Court is properly situated to, and should, compel arbitration.

## II.  LEGAL STANDARDS

### a.  The FAA's Strong Policy in Favor of Arbitration

The United States Supreme Court has recognized that the Federal Arbitration Act ("FAA") evinces a "liberal federal policy favoring arbitration agreements." *Moses H. Crone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).  "Questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration, and thus, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Armijo v. Prudential Ins. Co. of Am.*, 72 F.3d 793, at 797 (10th Cir. 1995).

### b.  The Existence of an Agreement to Arbitrate

The existence of an agreement to arbitrate is a threshold matter and this Court must "look to state law principles of contract formation" in determining whether such an agreement exists. *Fundamental Administrative Servs., LLC v. Patton*, 504 Fed. App'x 694, 698 (10th Cir. 2012).

---

[4] In the same footnote, the Southern District of California also suggested that it would be improper to consider the Amended Agreement because "the original contained a clause that stated any '[a]mendments will not apply retroactively to conduct that occurred prior to the effective date of the amendment.'" Dkt. No. 36-1 at 5 n.1.  Respectfully, the court appears to have overlooked the controlling language.  The relevant consideration when assessing whether the Original Agreement or the Amended Agreement controls is not the language in the *old* agreement, but rather the language in the *new* agreement; the Amended Agreement makes clear it "*supersedes all prior agreements*." Ex. 7 at § 15.5 (emphasis added); *see also Aero Tech Aviation Design, LLC v. Otto Aviation Grp, LLC*, 2017 WL 1397545, at *7–8 (D. Kan. April 18, 2017) (clause in amended contract providing that the amended contract "supersedes any prior written or oral agreements" "could not be clearer" in expressing the parties' "intent to extinguish the old contract and substitute the new").  And as explained above, the Amended Agreement clearly and specifically provides for retroactive application of the arbitration clause.

The Utah Supreme Court has long "recognized the important public policy behind enforcing arbitration agreements as an 'approved, practical, and inexpensive means of settling disputes and easing court congestion.'" *Cedar Surgery Center, L.L.C. v. Bonelli*, 96 P.3d 911, 914 (Utah 2004).

A "clickwrap" agreement "is a commonly used term for agreements requiring a computer user to consent to any terms or conditions by ***clicking on a dialog box*** on the screen ***in order to proceed with a . . . transaction***." *Hancock v. Am. Tel. and Tel. Co.*, 701 F.3d 1248, 1255 (10th Cir. 2012) (emphasis added). While Utah state courts have not yet directly addressed this issue, courts within the Tenth Circuit, including this District, recognize and enforce clickwrap agreements. *See id.* at 1255 (declaring that "courts generally uphold clickwrap agreements"); *Hugger-Mugger, L.L.C. v. Netsuite, Inc.*, 2005 WL 2206128, at *6 (D. Utah Sept. 12, 2005) (finding clickwrap agreement enforceable under California law); *Nazaruk v. eBay, Inc.*, 2006 WL 2666429, at *3 (D. Utah Sept. 14, 2006) (enforcing forum selection clause in clickwrap agreement). "Courts evaluate whether a clickwrap agreement's terms were clearly presented to the consumer, the consumer had an opportunity to read the agreement, and the consumer manifested an unambiguous acceptance of the terms." *Hancock*, 701 F.3d at 1256.

Under Utah contract law, "where a person signs a document . . . he will be bound by all of its provisions." *Semenov v. Hill*, 982 P.2d 578, 581 (Utah. App. 1999)). *See also Elsken v. Network Multi-Family Sec. Corp.*, 49 F.3d 1470, 1474 (10th Cir. 1995) (interpreting the same standard applied by Utah to reach the conclusion that "a party who signs a contract without reading it cannot avoid its legal effect that it did not read the contract or that the contents of the contract were not known to the party").

### c.  Delegation of Authority to Decide Arbitrability

When the parties to an arbitration agreement "clearly and unmistakably" agree to arbitrate arbitrability, the Court must grant the motion to compel arbitration.  *See Belnap v. Iasis Healthcare*, 844 F.3d 1272, 1281–84 (10th Cir. 2017).  "The Tenth Circuit has held that incorporation of arbitration rules that permit the arbitrator to determine its own jurisdiction into the agreement 'clearly and unmistakably' delegates arbitrability to the arbitrator." *Baugh v. Allied Prof'lss Ins. Co.*, 2019 WL 1358855, at *4 (D. Utah Mar. 26, 2019); *see also Inception Mining, Inc. v. Danzig, Ltd.*, 2018 WL 1940413, at *5 (D. Utah April 23, 2018) (incorporation of AAA rules constituted a delegation of arbitrability).

### d.  Dismissal in Favor of Arbitration is Appropriate

Dismissal of this action is appropriate if the Court finds the arbitration agreement enforceable.  *See Armijo*, 72 F.3d at 797 (finding no error when the trial court dismissed a case with prejudice pending arbitration instead of staying the matter); *see also Born v. Progrexion Teleservices, Inc.*, 2020 WL 4674236, at *12 n. 28 (D. Utah Aug. 11, 2020) (finding dismissal of claims in favor of arbitration appropriate when defendant moved to dismiss or, in the alternative, to stay).  The dismissal should be with prejudice.  *See Armijo*, 72 F.3d at 797.

## III.  ARGUMENT

### a.  Penhall Entered into a Valid and Enforceable Arbitration Agreement That Applies to Her Claims

Penhall admits she "click[ed] a button to continue with the transaction" on March 3, 2020, and Young Living's records corroborate her testimony.  Dkt. No. 25-1 ("Penhall Declaration") at ¶ 6; Ex. 1; Ex. 2 ("Gibbons Declaration"); Ex. 10.  But Penhall didn't just click a single button, she affirmed her assent to be bound by the Amended Agreement three times: first, when she clicked

the box indicating her "agree[ment] . . . to be bound by the terms and conditions of the Agreement"; second, when she clicked the button labelled "Agree and Continue"; and third, when she indicated that by placing her order she "agree[d] to Young Living's Policies and Procedures." Ex. 1; Ex. 2; Ex. 10.  Penhall also changed her password, updated her contact information, and confirmed her credit card information, before spending almost 15 minutes shopping and completing her purchases.  Ex. 10 at ¶ 18.  Her actions were not accidental.

At each step in the assent process, Penhall was prompted to review the Amended Agreement. Ex. 1 at ¶¶ 11–12, 16-17; Ex. 10 at ¶¶ 9–10, 12; Ex. 13–14, 16.  The fact that Penhall alleges she chose not to is her prerogative, but it is *no defense to enforcement* of the arbitration clause.  *Elsken*, 49 F.3d at 1474 ("a party who signs a contract without reading it cannot avoid its legal effect that it did not read the contract or that the contents of the contract were not known to the party").  "Clickwrap" agreements such as these are enforceable, and the Court should hold Penhall to the terms she expressly assented to.  *Hancock*, 701 F.3d at 1255; *Hugger-Mugger, L.L.C.*, 2005 WL 2206128, at *6; *Nazaruk*, 2006 WL 2666429, at *3.

Furthermore, Penhall's claims that she never intended to become a Young Living distributor again or to be bound by any amended agreement with Young Living when she accessed her account on March 3rd, created a new password, confirmed her contact information, agreed to be bound by the Amended Agreement multiple times, and spent 15 minutes shopping is *no defense* to enforcement of the Amended Agreement.  *See* Dkt. No. 25-1 at ¶ 9.  When analyzing the enforceability of clickwrap agreements, "[t]he inquiry does not focus on each party's subjective intent, but focuses on each party's *outward manifestation of intent*."  *Rojas v. GoSmith, Inc.*, 2020 WL 831585, at *3 (N.D. Ind. Feb. 20, 2020) (emphasis added).  This is because "[a]n objective

11

manifestation of assent is not rebutted by that same party's uncommunicated, subjective intent." *Vernon v. Qwest Communications Int'l, Inc.*, 857 F. Supp. 2d 1135, 1149 (D. Colo. 2012). "In the formation of contracts…it was long ago settled that secret, subjective intent is immaterial, so that mutual assent is to be judged ***only by overt acts*** and words rather than by the hidden, subjective intention of the parties."  18 Williston on Contracts § 4:1 (4th ed. 2020) (citing *Allen v. Bissinger & Co.*, 219 P. 539, 541 (Utah 1923)) (emphasis added).

Further, the fact that the Amended Agreement's arbitration clause applies retroactively, requiring the parties to arbitrate existing disputes (including the present one), is no defense to enforcement of the Amended Agreement.  "The FAA specifically gives full force and effect to such retroactive arbitration provisions."  *In re Universal Service Fund Telephone Billing Practices Litigation*, 300 F. Supp. 2d 1107, 1124 (D. Kan. 2003) (citing 9 U.S.C. § 2, which provides for the enforceability of "an agreement in writing to submit to arbitration an existing controversy); *see also Warrior Energy Servs. Corp. v. Last Run, LLC*, 2010 WL 4963028, at *3 (W.D. Okla. Dec. 1, 2010); *Zink v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 13 F.3d 330, 332 (10th Cir. 1993). Further, retroactive application is particularly reasonable when, as here, it is expressly provided for and limited to a single section (the dispute resolution section), and is triggered only when the Amended Agreement is expressly accepted by a user.  Ex. 7 at § 13.2 ("Amendments will not apply retroactively to conduct that occurred prior to the effective date of the amendment unless expressly accepted by the member.").  Ignorance is never an excuse to avoidance of a contract, particularly where a party repeatedly accepts terms she represents she reviewed and agreed to.[5]

---

[5] As she has previously, Penhall may attempt to rely on the *Morse* case from California to argue that the arbitration clause at issue in this case is not retroactive.  *See Morse v. ServiceMaster Global Holdings Inc.*, 2012 WL 4755035, at *3–4 (N.D. Cal. Oct. 4, 2012).  But *Morse* is distinguishable

### b. <u>The Arbitration Agreement Delegates Authority to the Arbitrator to Determine Arbitrability</u>

The Amended Agreement incorporates the JAMS rules and procedures to any arbitration proceedings between the parties, providing "[t]he arbitration will be filed with, and administered by, Judicial Arbitration and Mediation Services ('JAMS') under its rules and procedures." Ex. 7 at § 13.2.2. Under Tenth Circuit law, parties "clearly and unmistakably" agree to arbitrate arbitrability when they incorporate JAMS rules into their arbitration agreement. *Belnap*, 844 F.3d at 1281 (clause providing that arbitration would be held "in accordance with the rules of JAMS" incorporated the JAMS rules and constituted an agreement to arbitrate arbitrability); *see also Inception Mining, Inc.*, 2018 WL 1940413, at *5 (clauses providing arbitration would be held "under" and "in accordance with" the "Commercial Rules of Arbitration of the [AAA]" incorporated the AAA rules and constituted agreements to arbitrate arbitrability).[6] Because the Amended Agreement states that arbitration will be administered by JAMS "under its rules and procedures," it incorporates the JAMS rules. *Id.* Thus, the Court is "obliged to eschew consideration of the arbitrability of the claims and to grant the motion to compel arbitration. . ." *Belnap*, 844 F.3d at 1292.

---

in the most important way possible. The clause in that case did not explicitly state it applied "retroactively," as the present clause does. *Id.* at *3 ("there is no 'express, unequivocal' retroactive language in the Nguyen Arbitration Agreement").

[6] The JAMS rules provide that "[j]urisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted and ruled on by the Arbitrator. The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter." JAMS Rule 8(c).

**IV.      CONCLUSION**

Pursuant to the Amended Agreement, and even the Original Agreement, the Court should grant Young Living's Motion, it should dismiss or, in the alternative, stay the present proceedings, and it should compel the parties to arbitrate the claims asserted in Penhall's First Amended Complaint in Salt Lake City.

Dated: September 30, 2020                Respectfully Submitted,

                                         By:  */s/ Thomas M. Melsheimer*
                                         Thomas M. Melsheimer
                                         (*Pro Hac Vice*)
                                         TX Bar No. 13922550
                                         tmelsheimer@winston.com
                                         John C.C. Sanders, Jr.
                                         (*Pro Hac Vice*)
                                         TX Bar No. 24057036
                                         jsanders@winston.com
                                         Katrina G. Eash
                                         (*Pro Hac Vice*)
                                         TX Bar No. 24074636
                                         keash@winston.com
                                         J. Travis Underwood
                                         (*Pro Hac Vice*)
                                         TX Bar No. 24102587
                                         tunderwood@winston.com
                                         **Winston & Strawn LLP**
                                         2121 N. Pearl St., Suite 900
                                         Dallas, TX 75201
                                         Phone:  214-453-6500
                                         Fax:  214-453-6400

                                         Robert S. Clark
                                         Jeffrey J. Hunt
                                         David C. Reymann
                                         Bryan S. Johansen
                                         **PARR BROWN GEE & LOVELESS**
                                         101 S 200 E Ste 700
                                         Salt Lake City, UT 84111
                                         Phone:  801- 532-7840
                                         Fax:  801-532-7750
                                         rclark@parrbrown.com
                                         jhunt@parrbrown.com
                                         dreymann@parrbrown.com
                                         bjohansen@parrbrown.com

                                         *Counsel for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the above and foregoing document has been

served on September 30, 2020 to all counsel of record via e-mail.

*Katrina Eash*
Katrina G. Eash
