Nicole A. Skolout (10223)
TOMCHAK SKOLOUT
10 West 100 South, Suite 700
Salt Lake City, Utah 84101
Telephone: (801) 699-5388
nicole.skolout@tomchaklaw.com

Tarek H. Zohdy (*pro hac vice*)
Cody R. Padgett (*pro hac vice*)
CAPSTONE LAW APC
1875 Century Park East, Suite 1000
Los Angeles, California 90067
Telephone:  (310) 556-4811
Facsimile:   (310) 943-0396
tarek.zohdy@capstonelawyers.com
cody.padgett@capstonelawyers.com

Christopher D. Moon (*pro hac vice*)
Kevin O. Moon (*pro hac vice*)
MOON LAW APC
600 West Broadway, Suite 700
San Diego, California 92101
Telephone: (619) 915-9432
Facsimile:  (650) 618-0478
chris@moonlawapc.com
kevin@moonlawapc.com

*Attorneys for Plaintiffs Lindsay Penhall,*
*Sarah Maldonado, and Tiffanie Runnels*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| LINDSAY PENHALL, SARAH MALDONADO, and TIFFANIE RUNNELS, individually, and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>YOUNG LIVING ESSENTIAL OILS, LC,<br><br>Defendant. | **SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>Case No. 2:20-cv-00617-DBB-CMR<br><br>Judge David Barlow<br><br>Magistrate Judge Cecilia M. Romero<br><br>DEMAND FOR JURY TRIAL |

Plaintiffs Lindsay Penhall, Sarah Maldonado, and Tiffanie Runnels ("Plaintiffs"),

individually, and on behalf of a class of persons similarly situated, bring this class action against

Defendant Young Living Essential Oils, LC ("Young Living" or "Defendant") seeking equitable

relief and damages as set forth below.

## I.     NATURE OF THIS ACTION

1.      Young Living purports to sell essential oils when, in reality, it sells a convincing lie—the irresistible promise of financial success and "generous, industry leading compensation" by joining its unlawful pyramid scheme.

2.      Plaintiffs Penhall, Maldonado, and Runnels, and hundreds of thousands of putative class members just like them, paid and lost hundreds (and in many cases thousands) of dollars to become Young Living "distributors" based upon Defendant's false promise to "transform your financial future."

3.      Of course, the promise of riches was simply the hook used to grow Young Living's base of recruits, which is the true purpose of the organization and the source of immense profits for Defendant—at the expense of its distributors.

4.      Young Living falsely represents to its distributors that participation in Young Living—which necessarily requires hefty monthly payments—will result in material riches as long as they continue to solicit additional recruits to become distributors of the Young Living family.

5.      But that promise is nothing more than a pipe dream for Young Living's distributors.  In reality, Defendant has created nothing more than an unlawful pyramid scheme—the cornerstone of which is Young Living's emphasis on new distributor recruitment over the sale of its products.

6.      Indeed, in 2016, the median monthly income of 94% of distributors was $0 a month, and the average monthly income was a dismal $1 a month.  But these amounts do not include the hundreds of dollars in costs distributors incurred each year just to remain eligible to

earn commissions.  When these costs are accounted for, ***at least 97.5% of distributors lost money rather than earned money working for Young Living in 2016.***  In fact, in 2016, the average distributor ***lost $1,175.***

7.      And distributors did not fare any better in 2018.  Nearly 89% of distributors earned on average $4 for the ***year***.  And, again, this does not include the hundreds of dollars in costs incurred by distributors to achieve that dismal $4 annual income.  ***Similar to 2016, at least 96.7% of distributors lost money in 2018 rather than earned money working for Young Living.***

8.      Through this class action, Plaintiffs and the putative class seek to hold Defendant accountable for its illegal and deleterious conduct, which has injured hundreds of thousands of unwitting consumers who put their faith in Defendant's empty promises.

## II.     PARTIES

9.      Plaintiff Lindsay Penhall is a resident of San Diego, California. In 2018, Lindsay became a distributor of Young Living essential oils after being recruited by another distributor.  Lindsay lost nearly $2,000 dollars participating in the Young Living pyramid scheme.

10.     Plaintiff Sarah Maldonado is a resident of Dos Palos, California. In 2018, Sarah became a distributor of Young Living essential oils after being recruited by another distributor.  Sarah lost over $1,750 participating in the Young Living pyramid scheme.

11.     Plaintiff Tiffanie Runnels is a resident of Bakersfield, California. In 2014, Tiffanie became a distributor of Young Living essential oils after being recruited by another

distributor.  Tiffanie lost approximately $1,000 participating in the Young Living pyramid scheme.

12.    Defendant Young Living Essential Oils, LC is a Utah company with its principal offices and headquarters located in Lehi, Utah.  Young Living claims to "create abundance" for its distributors.  In reality, Young Living creates abundance only for itself through the unlawful operation of its vast pyramid scheme.

13.    Plaintiffs allege, on information and belief, that at all times herein, Defendant's agents, employees, representatives, executives, directors, partners, and/or subsidiaries were acting within the course and scope of such agency, employment, and representation, on behalf of Defendant.

## III.    JURISDICTION

14.    This Court has original jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the proposed Class consists of 100 or more members; the amount in controversy exceeds $5,000,000, exclusive of costs and interest; and minimal diversity exists.  This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

## IV.    VENUE

15.    This action is properly before this Court pursuant to 28 U.S.C. § 1391(b) given that Young Living is headquartered in the District of Utah and employs thousands of employees in Utah.

V.      **FACTUAL ALLEGATIONS**

A.      <u>**Background**</u>

16.     Founded in 1993 by D. Gary Young, Defendant claims to be the world leader in essential oils.  Defendant describes its essential oils as "aromatic, concentrated plant extracts that are carefully obtained through steam distillation, cold pressing, or resin tapping."

17.     Defendant's purported vision is to "bring Young Living Essential Oils to every home in the world."  Defendant's vision is also a lucrative one:  In 2017, sales of Defendant's more than 150 essential oils exceeded over **$1.5 billion**.  In addition, Defendant's revenues have increased over 800 percent over the last 6 years.

18.     Defendant also touts its purported values: "Always be honest. Young Living prides itself on strict compliance policies that keep us honest and transparent. Acquiring these characteristics can help us continue to progress the company."  In addition, Defendant instructs its distributors to "be sure to use good judgment[.]"

19.     But in practice, Defendant has fallen far short of upholding its self-professed values.  For example, Defendant's founder, D. Gary Young—who was not a medical doctor— opened a clinic in 1982 in Spokane, Washington.  The clinic offered unlicensed medical services, including childbirth.  In 1983, Young was the subject of a joint undercover investigation launched by the Spokane Police Department and the state of Washington.  During the course of the investigation, Young offered to deliver a baby, and he claimed that he could detect cancer with a blood test and treat the disease.  He was subsequently arrested and charged with practicing medicine without a license, to which he ultimately pleaded guilty.

20.     In 1986, while promoting himself as a naturopathic doctor, Young operated the

Rosarita Beach Clinic in Tijuana, Mexico, offering "detoxification" for cancer and lupus using

treatments whose efficacy was questioned in an investigative report by the *Los Angeles*

*Times*.  To test the veracity of Young's clinical diagnosis, a reporter submitted cat and chicken

blood to a clinic employee, who failed to determine that the samples were non-human, and

further diagnosed that the "patient" had an aggressive form of cancer and liver disease.  Young

also founded and operated the Young Life Wellness Center, a medical clinic in Chula Vista,

California, which in 1988 was ordered by a judge to be shut down.

21.     In 2000, Young opened the Young Life Research Clinic.  Located

in Springville, Utah, the clinic provided essential oils and alternative therapies to people

suffering from a variety of ailments, including depression and cancer.  In 2004, the Utah

Attorney General charged a clinic employee with practicing medicine without a license for

conducting diagnostic tests and prescribing products to patients at Young's clinic between

2000 and 2002.  The clinic had also employed a pediatrician whose medical license had

previously been suspended by the state medical board following a manslaughter conviction in

connection with the improper treatment and death of a cancer patient under his care.  In 2005,

the clinic settled a lawsuit with a patient who claimed that they were given infusions of vitamin

C that caused near-fatal renal failure.  Young then closed the Utah clinic and opened a new one

(Nova Vita Medical Clinic) in Guayaquil, Ecuador.

22.     Even more, in 2014, the U.S. Food and Drug Administration sent a warning

letter to Defendant for falsely promoting its products as viable treatments for certain viral

infections, including Ebola, Parkinson's disease, autism, diabetes, hypertension, cancer, multiple sclerosis, dementia, and other serious health issues.

23.     In 2017, Young Living pleaded guilty to federal charges and paid $760,000 for illegally trafficking certain oils in violation of the Lacey Act and the Endangered Species Act. Utah's U.S. Attorney called Young Living's natural resource violations "substantial."

24.     In 2018, Young Living was ordered to pay $1.8 million for pursuing a lawsuit in bad faith against a competitor.

25.     On November 24, 2020, the National Advertising Review Board ("NARB"), recommended that Young Living discontinue certain claims concerning its essential oils.[1] Specifically, the NARB determined that Young Living's claim that the oils are "therapeutic grade" is unsupported and recommended that it be discontinued.[2]  In addition, the NARB "also determined that Young Living's health-related product claims lack proper scientific substantiation and recommended that they be discontinued."[3]

26.     But most pernicious of all is that Defendant's immense wealth is derived from a vast, illegal pyramid scheme that has caused countless unwitting victims to lose substantial sums of money.

**B.     Pyramid Schemes, Like Young Living, Are Illegal**

27.     Defendant sells "essential oils" via a complicated multilevel marketing ("MLM") or "network marketing" operation.  The complex and intentionally hard-to-

---

[1] https://bbbprograms.org/media-center/decisions-details/narb-therapeutic-grade-essential-oils-claim.

[2] *Id.*

[3]*Id.*

understand multi-layer compensation/participation structure of Young Living is a hallmark of illegal MLM pyramid schemes.[4]

28.     While many consider every MLM company to be inherently fraudulent, the Federal Trade Commission ("FTC") has outlined guidelines it considers critical to distinguishing an illegal pyramid scheme from a "legitimate" MLM.  For example, a legal MLM program must structure its compensation so that the distributors are paid primarily based on sales of goods and/or services to those outside of the plan.  By contrast, an illegal pyramid scheme overwhelmingly rewards its participants for recruiting new distributors rather than through product sales made to persons outside the pyramid structure.

29.     In advising consumers about how to identify a pyramid scheme, the FTC stated, in relevant part:

> The promoters of a pyramid scheme may try to recruit you with pitches about what you'll earn. They may say you can change your life – quit your job and even get rich – by selling the company's products. . . . Often in a pyramid scheme, you'll be encouraged or even required to buy a certain amount of product at regular intervals, even if you already have more inventory than you can use or sell.  You may even have to buy products before you're eligible to be paid or get certain bonuses. . . . In addition, the company may say you can earn lavish rewards, like prizes, bonuses, exotic vacations, and luxury cars. However, it often turns out that you have to meet certain product purchase, recruitment, training, or other goals to qualify for the rewards, and only a handful of distributors ever qualify.[5]

30.     According to the California Department of Justice, "Millions of Americans have lost money in pyramid schemes. A pyramid scheme can take many forms, but generally

---

[4] *See* Exhibit A (Young Living's compensation plan).  Given the compensation plan's formatting, it is more easily viewed at https://static.youngliving.com/en-US/PDFS/compensation-plan.pdf.

[5] https://www.consumer.ftc.gov/articles/0065-multi-level-marketing-businesses-and-pyramid-schemes.

involves the promise of making money by recruiting new people. Pyramid schemes are illegal, and most people lose money."[6]

31.     Indeed, according to Jon M. Taylor, MBA, Ph.D., who has extensively studied and written about MLMs, and whose work is cited by the FTC:

> [T]o promote as a "business opportunity" an endless chain or pyramid selling activity (MLM) that in fact leads to almost certain loss for all but the founders and primary promoters (who are enriched from the purchases of victims/recruits), is a misrepresentation of the facts, and can lead to the defrauding of large numbers of participants. MLM is the epitome of the type of business activity the FTC[] is pledged to protect against – unfair and deceptive acts or practices. . . . It is not just a few MLMs that are conducting unfair and deceptive marketing practices, but virtually all of them, as all MLMs are built on a fundamentally flawed system of endless chain recruitment of participants as primary customers.[7]

32.     Here, Defendant operates an illegal pyramid scheme because the financial success of Young Living distributors is overwhelmingly dependent on the recruitment of new people into the Young Living sales force—i.e., the defining characteristic of an illegal pyramid scheme versus a legitimate MLM company.

**C.     How Young Living's Illegal Pyramid Scheme Works**

33.     To understand how Young Living's illegal pyramid scheme operates, consider the following illustration. Assume, hypothetically, that "John" wants to become a distributor of Young Living products and eligible for commissions and bonuses under Young Living's compensation plan.  To become a "distributor"—which is also the title of the lowest rank in

---

[6] https://oag.ca.gov/consumers/general/pyramid_schemes.

[7] Jon M. Taylor, MBA, Ph.D., Consumer Awareness Institute, *The Case (for and) against Multi-level Marketing*, 7-20, (2011), *available at* https://www.ftc.gov/sites/default/files/documents/public_comments/trade-regulation-rule-disclosure-requirements-and-prohibitions-concerning-business-opportunities-ftc.r511993-00008%C2%A0/00008-57281.pdf.

Young Living's pyramid scheme—John must first purchase a "starter kit." These kits range from "basic" ($35) to "premium" kits ($165)—however, the price can dramatically increase depending on whether additional options are selected. The premium kits typically come with a variety of essential oils and a diffuser—a device that disperses essential oils into the air to be inhaled or absorbed by the body.

34.     The vast majority of new distributors opt for the premium kits, largely because recruiters are actively encouraged by Young Living to push the premium kits over the basic kits and because certain bonuses are available if a new recruit purchases a premium starter kit.

35.     Therefore, John elects to purchase a premium starter kit for $165. The amount of money that John has personally spent on Young Living products is known as "Personal Volume" or "PV."

36.     Young Living gives each product a PV value, where each point is roughly equivalent to each dollar of goods purchased. So a $30 product would typically have a PV value of 30. PV is important because in order for John to be eligible for nearly all of the bonuses and commissions available under the Young Living compensation plan, he must maintain a monthly PV of 100. What this means is that a distributor must spend at least $1200 (12 months x $100) a year on Young Living products *just* to remain eligible to receive commissions and bonuses. In Plaintiff Lindsay Penhall's case, she purchased at least $100— often $300—of Young Living products each month in order to maintain her eligibility to earn commissions and bonuses. Likewise, Plaintiffs Sarah Maldonado and Tiffanie Runnels also purchased a minimum of $100 per month in order to maintain their eligibility to earn commissions and bonuses.

37.     Having purchased the premium starter kit and having spent more than $100—or 100 PV—John is ready to start recruiting, because John realizes that under the compensation plan, **he has to recruit** to (1) become eligible for nearly all bonuses and commissions available to distributors, (2) advance in rank at Young Living, which is necessary to unlock the most lucrative bonuses and commissions, and (3) make enough money just to cover the $100 monthly PV requirement.

38.     John is able to convince his friends "Sam" and "Jenn" to become Young Living distributors.  Under Young Living's pyramid scheme, Sam and Jenn are considered the first "level" of John's "downline."  "Downline" is the term for all Young Living members beneath a particular distributor.  "Upline," on the other hand, is any distributor above another distributor, such as the distributor who recruited John.

39.     Sam and Jenn are also each considered a "leg" in John's downline (much like a branch in a family tree).  "Legs" are important because a certain number of legs are necessary to qualify for specific bonuses and commissions, as well as to advance in rank.  Again, recruiting is essential to advance in the Young Living pyramid scheme.

40.     Assume that Sam recruits a new distributor, "Mary."  Mary would be considered the first level of Sam's downline and she would be considered the second level of John's downline.  Mary would also be part of Sam's leg.  Similarly, if Jenn recruited a new distributor ("Andy"), Andy would be considered the first level of Jenn's downline and he would be considered the second level of John's downline.



41.     Another important term in the Young Living pyramid scheme is "Organization Group Volume" or "OGV."  OGV is the entire sales volume in a distributor's downline.  For example, if John, Sam, Jenn, Mary, and Andy all purchase $100 worth of product in a given month, or 100 PV, John's OGV would be 500.  A distributor's OGV also determines whether that distributor qualifies for certain bonuses and commissions under the compensation plan, and achieving certain OGV thresholds is required to advance in rank in the Young Living pyramid scheme.

> **D.     The Young Living Compensation Plan Encourages the Recruitment of Distributors over Retail Sales**

42.     The Young Living compensation plan rewards the recruitment of new distributors far more than the sale of product outside of the pyramid.

43.     In describing the structure of its "generous, industry leading compensation plan," Defendant ***admits*** its compensation structure is designed to "help you build your

business with compensation that **rewards you as you grow**" (i.e., recruit more distributors).
Indeed, Defendant stated on its website:

> If you're ready to achieve your dream of independence and security, our generous, industry-leading compensation plan will help you get there. It's all about caring for our Young Living family, and another example of our commitment to total body wellness. Through our three-level approach, we've developed an efficient structure to help you build your business with compensation that rewards you as you grow.
>
> **1. Create a Foundation**
>
> Every business needs a solid foundation. With our Rising Star Team Bonus you can achieve abundance as you progress from distributor all the way up to executive.
>
> **2. Build Your Business**
>
> Once you've seen the benefits of being your own business, you're ready to share that experience with others. Build on your foundation by adding others to your team to achieve shared success.
>
> **3. Become a Leader**
>
> With an established business and a passion for inspiring wellness through Young Living, you're ready to take the mission worldwide as you lead others to success.

44.     Notably absent from Defendant's message is any emphasis on selling product outside of the pyramid.

45.     The products that comprise a distributor's PV are purchased at a 24% discount and, at least theoretically, can be resold by each distributor, who could retain any difference between the discount and the retail price for which they might sell the product.

46.     Critically, however, is that there is no real incentive for a distributor to try to become a reseller of oils as opposed to recruiting more downline distributors—for at least two important reasons.  First, there is no real opportunity for a distributor to profit from becoming a reseller of oils at a mark-up because anyone can buy the oils at the discounted "wholesale"

price directly from Young Living.  Second, distributors do not earn any commissions on the PV they purchase from Young Living.

### 1. Young Living's Bonus and Commission Structure Depends on Recruitment

47.     Young Living's compensation plan is comprised of a variety of bonuses and commissions, and in order to receive nearly all of them, a distributor must recruit new distributors.  In addition, the compensation plan encourages distributors to make sure their downline is also recruiting—and the more recruits, the better.

48.     For example, under the compensation plan's "**Unilevel Commission**" structure, each level of new distributor in a distributor's downline can generate additional commissions for the distributor.  Specifically, a distributor can earn 8% on the PV[8] of each distributor on the first level of his or her downline, 5% on the second level, and 4% on levels three through five. And as a distributor's downline grows through recruiting, the money earned through these commissions also grows—the effect of the which is to incentivize a distributor to personally recruit, and to make sure his or her downline recruits.

49.     Young Living also provides the "**Generation Commission**" structure for those lucky—and few—distributors who can reach the rank of Silver[9] or above.  The **Generation Commission** structure pays commissions on the sales volume of certain qualifying distributors

---

[8] "Personal Volume," i.e., the amount of money personally spent on Young Living Products. *See* Section V(C), *supra* at page 8-9

[9] In order to become a "Silver," a distributor must have recruited at least two new distributors, each of whom must be a "leg" in that distributor's downline, and each leg must have an Organization Group Volume / OGV of 4,000 (that is, the entire sales volume of each leg must be roughly $4000 a month). *See* Section V(D)(2), *infra* at page 14.

(those Silver and above) in the downline.  And as a distributor advances in rank (i.e., recruits more distributors), the commissions available to the distributor also increase.  For example, at the rank of Royal Crown Diamond, the distributor is paid commissions on up to eight "generations" of distributors (Silver and above) in his or her downline.  Therefore, like the **Unilevel Commission** structure, the **Generation Commission** structure also incentivizes a distributor to personally recruit, and to make sure his or her downline recruits.

50.     In addition, Young Living provides the "**Fast Start**" bonus, which a distributor can earn when he or she personally enrolls a new distributor.  Specifically, the Fast Start bonus pays a 25% commission on the PV of each personally recruited distributor during his or her first three calendar months.  And if the newly recruited distributor enrolls a new distributor, the Fast Start bonus pays a 10% commission to original distributor.  In other words, if John recruits Sam, John earns 25% of Sam's PV during Sam's first three months.  And if Sam recruits Mary, John earns 10% of Mary's PV (and Sam would earn 25% of Mary's PV) during Mary's first three months.   Again, the Fast Start bonus is just another way Young Living encourages recruitment.

51.     Even more, Young Living provides the "**Starter Kit**" bonus, which pays $25 to a distributor each time he or she personally recruits a new distributor who purchases a premium starter kit.

52.     There is also the "**Rising Star Team**" bonus, which is yet another incentive for distributors to recruit new distributors.  Specifically, distributors who have obtained the ranks of "Star," "Senior Star," and "Executive," can earn "shares" in a certain pool of money Young living sets aside each month. Each share that can be earned depends on certain requirements,

including how many "legs" the distributor has in his or her downline, up to seven legs.  In other words, to earn the most shares possible, a distributor must have recruited **seven** new distributors.  And no shares can be earned unless a distributor has recruited at least **three** new distributors.

53.     In addition, the "**Elite Express**" bonuses reward distributors who not only recruit, but who recruit fast enough to advance in rank within a certain period of time.  For example, the "Gold in 8" bonus is earned if a distributor reaches the rank of Gold[10] within eight months of first obtaining the rank of Silver.  The "Platinum in 8" bonus is earned if a distributor reaches the rank of Platinum within eight months of first obtaining the rank of Gold.  And the "Diamond in 8" bonus is earned if a distributor reaches the rank of Diamond within eight months of first obtaining the rank of Platinum.  And, as described herein, none of these bonuses can be achieved without recruiting new distributors who, in turn, also recruit to similarly benefit under the compensation plan.

### 2.     Advancing in "Rank" Also Depends on Recruitment

54.     As alleged herein, the amount of income a distributor can earn under Young Living's compensation plan is generally based on his or her "rank."[11]  That is, the higher the rank, the more money a distributor can make.  However, Young Living's compensation plan

---

[10] To become a "Gold," a distributor must have at least three legs (three recruited distributors), and each leg must have 6,000 OGV (that is, the entire sales volume of each leg must be roughly $6,000 a month. Successive ranks of Gold, Platinum, Diamond, Grown Diamond, and Royal Crown Diamond have incrementally increasing requirements.

[11] The full complement of ranks available under the Young Living compensation plan are as follows (from lowest to highest):  1) Distributor; 2) Star; 3) Senior Star; 4) Executive; 5) Silver; 6) Gold; 7) Platinum; 8) Diamond; 9) Crown Diamond; and 10) Royal Crown Diamond.

not only encourages distributors to advance in rank, it encourages them to advance quickly. Most importantly, a distributor cannot advance in rank *unless he or she recruits new distributors.*

55.     Consider, for example, the rank of "**Silver**."  In order to become a Silver, a distributor must have recruited at least two new distributors, each of whom must be a "leg" in that distributor's downline, and each leg must have an OGV of 4000 (that is, the entire sales volume of each leg must be roughly $4000 a month).  To become a "**Gold**," a distributor must have at least three legs (three recruited distributors), and each leg must have 6,000 OGV.  A "**Platinum**" distributor must have at least four legs (four recruited distributors), each of which must have 8,000 OGV.  A "**Diamond**" distributor must have at least five legs (five recruited distributors), each of which must have 15,000 OGV.  A "**Crown Diamond**" must have at least six legs (six recruited distributors), each of which must have 20,000 OGV.  And a "**Royal Crown Diamond**" (the highest rank) must have at least six legs, each of which must have 35,000 OGV.  As is clear, recruiting is essential to advancing in Young Living's pyramid scheme.

56.     Young Living also offers distributors an opportunity to attend lavish, all-expenses-paid "Recognition Retreats" held all over the world, where a distributor can participate in "once-in-a-lifetime activities."  However, to qualify to attend one of these retreats, a distributor must be at least a Silver in rank, which necessarily requires the distributor to have recruited.

57.     Even the names of the ranks are intended to falsely convey to new distributors the promise of wealth—such as "Gold," "Platinum," and potentially, the elusive rank of "Royal Crown Diamond."  The problem is, these higher tiers are virtually unattainable.

58.     Consider, for example, Young Living's highest rank of "Royal Crown Diamond."  The required monthly OGV is a staggering 1,500,000.  In order to meet an OGV of 1,500,000, a distributor would need a downline of more than 15,000 distributors each purchasing the minimum PV.  Because attrition and failure to order minimum PV is not uncommon, it is likely a distributor would actually need a downline consisting of many multiples of that number.  Thus, it is not surprising that an infinitesimally small number of distributors have ever actually achieved any meaningful success.  Indeed, while Young Living brazenly touts the achievement of becoming a "Royal Crown Diamond" as within the grasp of all of its distributors, a mere 46 have ever achieved this goal. Young Living claims it has 3,000,000 active distributors, but does not report on the number of *former* distributors. Thus, only .0015% of active distributors have made it to the top of the pyramid, and the percentage of all distributors is very likely much, much smaller.

59.     And even more shocking is that Young Living doesn't even pay monetary commissions to many of those lucky few who are able to amass a downline that purchases the minimum level of OGV each month.  To the contrary, if a distributor's earned commission is less than $25 in a single month, Young Living issues a credit, which can be used by the distributor only to buy more product. So, if a distributor's OGV isn't large enough each month to trigger a commission check, his or her only option is to recruit even more distributors in hopes of driving up OGV.

60.     Defendant's singular focus on recruitment is further exemplified by its appropriately titled "On the Grow Tour," which is a series of "Education Events" held throughout the country.  As part of the tour, distributors can participate in a "Grow Tour Challenge" where distributors must enroll two new distributors with a premium starter kit within a certain time period, as well as post certain information on social media to "encourage others to grow with you."  By doing so, a distributor will "receive on-stage recognition for growing your team," as well as a gift.

61.     In short, this is not a system designed to sell product to those outside the pyramid.  Rather, the entire system is designed for one purpose: to recruit new distributors to grow the illegal pyramid, which only benefits Defendant and those very few distributors at the top.

E.     **Young Living's Egregious Misrepresentations and Omissions Concerning the Financial Success a Person Will Achieve by Becoming a Young Living Distributor**

62.     Young Living represents, either expressly or by implication, that by becoming a Young Living distributor, a person will likely earn substantial income and/or achieve financial success—what Young Living calls "abundance" or "income opportunity."  Young Living makes these representations through a variety of channels, including its website, "youngliving.com," print materials, videos, social media, live presentations, events and trainings, income testimonials, and through other means.

63.     Examples of the false and misleading representations Young Living has made and makes to recruit new distributors include the following from its website:

- "Have you ever wanted to truly own your time—and your life?  What if going to work every day was exciting and enjoyable, and you no longer had to wonder how you were

going to pay the bills?  Young Living's generous compensation plan gives you the power to take control of your future and build a business that will change your life forever."

- "If you're ready to achieve your dream of independence and security, our generous, industry leading compensation plan will help you get there."

- "With a Young Living business, you're on a path to a different type of lifestyle—one with the potential to earn free products, transform your financial future, and bring life-changing solutions to homes around the world."

- "Every business needs a solid foundation.  With our Rising Star Team Bonus, you can achieve abundance as you progress from distributor all the way up to executive."

- "With dedicated support from Young Living and your team and a comprehensive compensation plan, you can take control of your future by building a rewarding business."

- "Young Living offers an industry-leading compensation plan with generous commissions and bonuses."

64.     Even more egregious, Young Living actually *requires* its distributors to further its deception.  Specifically, Young Living requires that "[t]o qualify for compensation under Young Living's Compensation Plan . . . . [distributors] have the responsibility to promote Young Living products **and the Young Living income opportunity**."[12]  The effect of which is that Young Living has engaged in a long-term advertising campaign that promoted—albeit misleadingly—that becoming a distributor of Young Living products will lead to financial success and/or meaningful income.

65.     Indeed, while Young Living requires all of its distributors to promote its deceptive "income opportunity," several distributors at the top of the Young Living pyramid have been and continue to be crucial in spreading the deception.

---

[12] *See* Young Living's U.S. Policies and Procedures, § 3.12.2 (2018).

66.     One of the most influential and recognizable figures in multilevel marketing generally is Richard Brooke, who is the self-professed "Super MLM Man." Mr. Brooke has been involved in MLMs for over 40 years. During that time, Mr. Brooke has taught current and prospective MLM distributors "The Secret Formula For Success" ("Formula"). Put plainly, to be financially successful in MLMs, the Formula requires current distributors to enroll new distributors. Specifically, the Formula requires distributors to personally recruit "3 Business Builders [or distributors] a Month" until "your business runs away from you."[13] Indeed, Brooke states, "You're either enrolling or you're not enrolling."[14]

67.     In fact, Mr. Brooke quite pointedly admits, "Our business lives and dies on duplication. **It lives and dies on enrollment of new distributors**."[15] Mr. Brooke further explains that this is necessary because if there is no continued enrollment, then there is no "opportunity" for new distributors; that is, according to Mr. Brooke, "you need to keep recruiting for the opportunity to be real for new people to come into the business."[16] In other words, Mr. Brooke describes the operation of a classic pyramid scheme.

68.     In 2017, Young Living purchased Mr. Brooke's company, Life Matters, which used multilevel marketing to sell health supplements and personal care products. Thereafter, Mr. Brooke joined Young Living to help share "abundance with people all over the world."[17]

---

[13] https://www.youtube.com/watch?v=iw4j-c3c394&app=desktop.

[14] *Id*.

[15] *Id*.

[16] *Id*.

[17]*See* https://www.youngliving.com/en_US/company/media/announcements/young-living-essential-oils-acquires-life-matters-in-non-cash-acquisition.

69.     Mr. Brooke, who is a "Diamond" rank in Young Living, was the Keynote Speaker at the 2018 Young Living convention in Canada.  In his address, Mr. Brooke noted that Young Living is a "$1.7 or 2 billion a year" company.[18]  Mr. Brooke then asked the audience, "How are we going to get to $10 billion?"  Mr. Brooke's answer was very revealing: "We are going to recruit our way there."[19]  In other words, Young Living's financial success is dependent on the recruitment of new people—the defining characteristic of an illegal pyramid scheme.

70.     Another influential Young Living distributor is Kimmy Brooke, who is married to Richard Brooke and who is also a "Diamond" distributor.  Ms. Brooke travels around the world speaking at various Young Living events to teach current and prospective distributors how to be financially successful.  In particular, Ms. Brooke teaches the "Young Living Geometric Progression" approach to becoming financially successful.[20]

71.     In mathematics, geometric progression is a sequence of numbers where each term after the first is found by multiplying the previous one by a fixed, non-zero number called the common ratio.  For example, 2, 6, 18, 54, etc., is a geometric progression with common ratio 3.

72.     In the context of Young Living, this means that, for example, if a distributor recruits two new distributors, who each, in turn, recruit two new distributors, and so on, the

[18] https://www.youtube.com/watch?v=4yc-b2_KkSM&app=desktop.

[19] *Id.*

[20] https://www.youtube.com/watch?v=taHBNyAVrqI.  Geometric progress is also a concept that Richard Brooke teaches.

number of distributors in a person's downline grows exponentially, which purportedly leads to "financial success." Accordingly, financial success is directly dependent on recruiting.

73.     However, geometric progression is the ***fundamental basis of a pyramid scheme structure****, and demonstrates why pyramid schemes are always doomed to fail: their growth cannot continue infinitely, as the pool of potential new distributors is necessarily limited.[21] Therefore, Ms. Brooke's teachings merely underscore the very illegality of Young Living's structure.

74.     Ms. Brooke even stated in one of her presentations at a Young Living event, "I said I would never join network marketing, I was one of those people . . . I would never do that **pyramid thing**," at which point Ms. Brooke showed a photo of Richard Brooke holding a pyramid. Ms. Brooke then stated that because she said "yes" to network marketing or MLM, she has been able to meet a variety of famous people, write a book, live on an island in a dream home with an unobstructed ocean view, among other purported indicia of success.[22]

---

[21] *See, e.g.*, https://en.wikipedia.org/wiki/Pyramid_scheme. *See also F.T.C. v. Turner*, No. 79-474-ORL-CIV-R, 1982 WL 1947, at *2 (M.D. Fla. Dec. 29, 1982) ("The continual recruitment of additional participants became impossible when the **geometric progression** exhausted the number of potential investors available in a given community. Thus, promised profits from the sale of distributorships did not occur due to exhaustion of the number of people willing to invest.") (emphasis added); https://cca.hawaii.gov/blog/pyramid-schemes/ (According to the State of Hawaii's Department of Commerce and Consumer Affairs, "A marketing program which makes claims of fantastic profits from a downline may be deceptive and illegal. This is because the profit structure of a pyramid is based on a **geometric progression**. At a very early point in the pyramid, it would take an unrealistic number of downline people to keep the structure going. All later participants, therefore, would have no chance of reaping the benefits being advertised.") (emphasis added).

[22] *Id.*

75.     Arguably the most recognizable and prolific spokesman for Young Living is Adam Green.  Mr. Green was the youngest Young Living distributor to reach "Royal Crown Diamond"—the highest rank at Young Living.  Mr. Green has tens of thousands of distributors in his downline, who are spread across 28 countries.

76.     Mr. Green travels the world "as a messenger for the company,"[23] speaking at various Young Living events to teach current and prospective distributors how to be financially successful.  In fact, Mr. Green has been a regular speaker at Young Living's annual convention since 2010.

77.     In describing how to be financially successful at Young Living, Mr. Green also teaches the concept of geometric progression, which he calls "duplication."[24]  At one Young Living event, Mr. Green candidly stated that "duplication is required for success" at Young Living.[25]  In fact, Young Living repeats Mr. Green's message on its website:  "Duplication is the foundation for success in our business."[26] Even more, regarding duplication or geometric progression, Mr. Green stated, "This is the basic premise of which we try to function [sic] all of our business decisions on, is will it duplicate."[27]  In this regard, Mr. Green admits that "there is no way to ever ever ever get to Crown Diamond by yourself."[28]

---

[23] https://www.youtube.com/watch?v=iK7N5iuEFrk.

[24] *See, e.g.*, https://www.youtube.com/watch?v=94r2x0Qv48Q.

[25] *Id.*

[26] https://www.youngliving.com/blog/get-to-know-young-livings-newest-and-youngest-royal-crown-diamond/.

[27] *Id.*

[28] https://www.youtube.com/watch?v=94r2x0Qv48Q.

78.     The following is a PowerPoint slide Mr. Green presented demonstrating how duplication works:

# 24 Vs 531
## Vicki Opfer's Duplication Model

| Month | You Enroll | OR | Total Number of People From Last Month (Old) | They Each Eroll 2 (New) | | Plus Your 2 New People | | New Total PPL in Your Group Old + New + Your 2 | Assuming 165PV order Volume |
|---|---|---|---|---|---|---|---|---|---|
| January | 2 | | | | | 2 | | 2 | 330 |
| February | 2 | | 2 | + | 4 | + | 2 | = | 8 | 1,320 |
| March | 2 | | 8 | + | 16 | + | 2 | = | 26 | 4,290 |
| April | 2 | | 26 | + | 52 | + | 2 | = | 80 | 13,200 |
| May | 2 | | 80 | + | 160 | + | 2 | = | 242 | 39,930 |
| June | 2 | | 242 | + | 484 | + | 2 | = | 728 | 120,120 |
| July | 2 | | 728 | + | 1,456 | + | 2 | = | 2,186 | 360,690 |
| August | 2 | | 2,186 | + | 4,372 | + | 2 | = | 6,560 | 1,082,400 |
| September | 2 | | 6,560 | + | 13,120 | + | 2 | = | 19,682 | 3,247,530 |
| October | 2 | | 19,682 | + | 39,364 | + | 2 | = | 59,048 | 9,742,920 |
| November | 2 | | 59,048 | + | 118,096 | + | 2 | = | 177,146 | 29,229,090 |
| December | 2 | | 177,146 | + | 354,292 | + | 2 | + | 531,440 | 87,687,600 |
| Totals for Year | 24 | | | | | | | 531,440 | |

TRANSFORMATION

YOUNG LIVING

79.     In addition, Richard Brooke authored the book, *The Four Year Career, Young Living Edition.*"  In the book, Mr. Brooke describes the importance of geometric progression to network marketing or MLMs, calling geometric progression a "law" of networking marketing. Indeed, Mr. Brooke states, "The path to gathering one thousand, two thousand or thirty thousand people to 'sell for you' in Network Marketing is geometric progression.  This is made possible by the Rule of Law in Network Marketing . . .that everyone regardless of rank or time involved is encouraged to invite and enroll others." Even more, Mr. Brooke states, "Geometric progression is to Network Marketing what compounding is to wealth building."

80.   Mr. Brooke includes the following two graphics in his book to describe geometric progression:

Graphic One:



Graphic Two:



81.     On information and belief, Richard Brooke's, Kimmy Brooke's, and Adam Green's representations, as described herein, were relied on by thousands of individuals—if not tens of thousands—in deciding to become Young Living distributors.

82.     In fact, prior to becoming a Young Living distributor, Plaintiff Lindsay Penhall viewed videos of Richard Brooke and relied on his representations, as described herein, which further caused Lindsay to believe she would be financially successful by becoming a Young Living distributor.

83.     Richard Brooke, Kimmy Brooke, and Adam Green were and are agents of Young Living, and they have conspired with Young Living to further its unlawful business practices, as described herein, and have substantially contributed to Young Living's long-term, deceptive advertising campaign.

84.     In addition, through its **"S.E.T."** strategy, Young Living also instructs its distributors to utilize geometric progression in order to be financially successful.  Specifically, upon joining Young Living, Defendant informs each of its distributors that "[t]he choice to join Young Living is a choice to get the most out of life—to take charge of your future[.]"  Further, "If you are ready to make the most of your Young Living journey, just follow our three simple S.E.T. steps for discovering and sharing your favorites: Start, Essential Rewards, Three = Free. Ready? Get S.E.T. and go!" And, according to Young Living, "Completing your S.E.T. steps is essential to starting your Young Living journey right."

85.     As relevant here, the third step, "Three = Free," requires distributors to recruit three new distributors.  And once a distributor has recruited those three, the distributor must "help your team members replicate the S.E.T. model themselves."  In other words, help each

new distributor also recruit three new distributors, and so on.  The S.E.T. strategy is nothing more than geometric progression—the foundation of an illegal pyramid scheme structure.

86.     Unfortunately, Young Living's very structure ensures that nearly every new distributor will almost certainly lose large sums of money, chasing the elusive promise of "abundance" by trying to recruit additional new distributors from an ever-shrinking pool of available candidates.

87.     And Young Living's distributors' losses are compounded by its structure, which requires its distributors to continuously purchase (and, as a result, hold) an ever-growing inventory of unused product, in direct violation of the 70/30 rule established in the FTC's seminal *Amway* ruling.[29]

### 1.   Young Living Distributors Are Encouraged to Violate the 70/30 *Amway* Rule

88.     Beyond Young Living's overwhelming dependence on recruitment income, Young Living's status as an unlawful pyramid scheme is further evidenced by its brazen violation of the so-called 70/30 rule.  In the FTC's 1979 *Amway* ruling, it concluded that Amway did not operate as a pyramid scheme, in part, because Amway required its representatives to submit proof of resale demonstrating no more than 30% of purchased product was for personal use or storage before permitting its representatives to purchase additional product—thus the term "70/30."  *See Matter of Amway Corp., Inc.*, 93 F.T.C. 618 (1979)

---

[29] *See Matter of Amway Corp., Inc.*, 93 F.T.C. 618 (1979).

89.     The 70/30 rule is designed to prevent an MLM from encouraging its members to continuously order new product for sale (sometimes referred to as "inventory loading") in order to be eligible to earn commissions.  Here, Young Living's compensation system actually requires its distributors to inventory load product.  If a distributor fails to meet his or her minimum monthly PV, he or she is not eligible to earn any commissions on his or her downline's OGV no matter how large that OGV may be.

90.     Young Living is well aware of the 70/30 rule. Its policies and guidelines even say that no more than 30% of ordered PV can be stored prior to purchasing additional inventory.  But this is mere lip-service.  Young Living does absolutely nothing to enforce this policy and is well-aware that it is routinely violated.  Young Living has no method of compliance in place, and it requires no proof that its distributors are actually selling their PV. Any distributor can order as much PV as he or she wants, whenever he or she wants.  And Young Living turns a blind eye, because doing so helps further its scheme.

91.     And, unlike MLMs that sell physically large products, which impedes inventory loading, the opposite is true of Young Living's products. Young Living's oils are contained in small, easily stored vials, which actually facilitate inventory loading.  Most vials contain only 5 ML to 15 ML of product and each one can sell for $20 or more.  At that size and price, a single closet shelf would be enough space for a failing Young Living distributor to store literally thousands of dollars in unsold product, hoping against hope that his or her downline OGV will grow large enough to trigger a meager commission.

**F.**   <u>**Nearly All Young Living Distributors Lose Money**</u>

92.    Unfortunately, Young Living's promised financial success remains elusive to nearly all distributors.  In 2016, the median monthly income of 94% of distributors was $0 a month, and the average monthly income was a dismal $1 a month!  But these amounts do **<u>not</u>** include the hundreds of dollars in costs distributors incur each year to remain eligible to earn commissions downline.  When these costs are accounted for, *at least 97.5% of distributors lost money rather than earned money working for Young Living in 2016*.[30]  In fact, in 2016, the average distributor *lost $1,175.*

93.    Distributors did not fare any better in 2018.  Nearly 89% of distributors earned on average $4 for the *year*.  And, again, this does not include the hundreds of dollars in costs incurred by distributors to achieve that dismal $4 annual income.  *Similar to 2016, at least 96.7% of distributors lost money rather than earned money working for Young Living.*[31]  *See* https://www.ftc.gov/news-events/press-releases/2019/10/multi-level-marketer-advocare-will-pay-150-million-settle-ftc (The FTC alleged that Advocare operated an illegal pyramid scheme and "AdvoCare did not offer consumers a viable path to financial freedom. In 2016, 72.3 percent of distributors did not earn any compensation from AdvoCare; another 18 percent earned between one cent and $250; and another 6 percent earned between $250 and $1,000. The annual earnings distribution was nearly identical for 2012 through 2015.").

---

[30] Specifically, according to Defendant's 2016 Income Disclosure, the average yearly income of 97.5% of distributors did not cover the minimum yearly costs to remain eligible to earn commissions and bonuses.

[31] Specifically, according to Defendant's 2018 Income Disclosure, the average annual income of 96.7% of distributors did not cover the minimum annual cost to remain eligible to earn commissions and bonuses.

94. Moreover, even the smaller-than-promised potential earnings described herein do not account for the significant additional outlays of time and money that distributors are forced to incur just to maintain their business, including traveling around the country to Young Living conferences or meetings, and organizing their own sales events. In addition, since distributors are not classified as employees but as independent contractors of Young Living, they are responsible for paying self-employment taxes and for their own health insurance or other typical job-related benefits.

95. This is not "abundance." Rather, this is the very definition of an illegal pyramid scheme. And Defendant's misleading and deceptive representations concerning a consumer's ability to earn income does not only violate Defendant's self-professed values—it's unlawful.

96. Plaintiffs and Class Members relied on Defendant's material misrepresentations concerning the income opportunity and/or financial success a consumer can achieve by becoming a Young Living distributor.

97. And, as described herein, Defendant willfully failed to disclose and continues to fail to disclose that the program's structure ensures that most distributors will not earn any—much less meaningful—income.

98. In addition, Defendant willfully failed to and continues to fail to adequately disclose its appalling—and certainly material—income statistics.

99. Further, Defendant willfully failed to disclose and continues to fail to disclose that it operates an illegal pyramid scheme.

100.    Had Plaintiffs and reasonable consumers known that Defendant was operating an illegal pyramid scheme and/or had they known that nearly all distributors lose money rather than make money, they would not have become distributors or would have acted differently.

101.    Unfortunately, Plaintiffs and Class Members have suffered an injury in fact and have lost money because of Defendant's unlawful misrepresentations and omissions.

G.    **Young Living Is an Illegal Pyramid Scheme**

102.    By any measure, Young Living is unequivocally a pyramid scheme.

103.    Numerous government agencies, legal opinions and experts have all recognized that MLM companies—like Young Living—which emphasize distributor recruitment over product sales, earn the majority of their revenue from recruitment, and make no effort to enforce the "70/30" rule, are in fact illegal pyramid schemes.[32]

104.    Indeed, in 2015, the FTC sued Arizona-based Vemma Nutrition Company in the District Court of Arizona for running an illegal pyramid scheme utilizing a very similar pay structure and model utilized by Young Living.[33]

105.    In December 2016, Vemma admitted it was running an illegal pyramid scheme and agreed to a judgment that included $238 million in monetary damages, as well as an

---

[32] *See e.g., Stull v. YTB Intern., Inc.*, CIV. 10-600-GPM, 2011 WL 4476419, *5 (S.D. Ill. Sept. 26, 2011) (noting the fact that travel-based pyramid scheme's revenues were largely derived from new recruits supported allegation it was a pyramid scheme).

[33] *See FTC v. Vemma Nutrition Co., et al.*, 15 CV 01578 – PHX (D. Ariz.) (ECF No. 1).

injunction that prohibits Vemma from, *inter alia,* engaging in the very same acts which Young

Living is engaging here.[34]

106.   According to the FTC:

[Vemma,] [t]he multi-level marketing (MLM) company[] which sells health and wellness drinks through a network of distributors called "affiliates," will be prohibited under a federal court order from paying an affiliate unless a majority of that affiliate's revenue comes from sales to real customers rather than other distributors. The order also bars Vemma from making deceptive income claims and unsubstantiated health claims.

"Unfortunately, extravagant income claims and compensation plans that reward recruiting over sales continue to plague the MLM industry," said Jessica Rich, Director of the FTC's Bureau of Consumer Protection. "MLM companies must ensure that their promotional materials aren't misleading, and that their compensation programs focus on selling goods or services to customers who really want them, not on recruiting more distributors."[35]

107.   Specifically (and just like Vemma), the overwhelming majority of distributors

will not even recoup the money that they paid to Young Living to become a distributor and be

part of Young Living's sales force.

108.   Conversely (and just like Vemma), Young Living's enormous revenue is largely

based on the money it receives from its own distributors to be part of the sales force, and the

products its sales force are required to purchase.[36]

---

[34] *See* FTC Release "Vemma Agrees to Ban on Pyramid Scheme Practices to Settle FTC Charges." https://www.ftc.gov/news-events/press-releases/2016/12/vemma-agrees-ban-pyramid-scheme-practices-settle-ftc-charges.

[35] *Id.*

[36] *See also* https://www.ftc.gov/news-events/press-releases/2019/10/multi-level-marketer-advocare-will-pay-150-million-settle-ftc (On October 2, 2019, "Multi-level marketer AdvoCare International, L.P. and its former chief executive officer agreed to pay $150 million and be banned from the multi-level marketing business to resolve Federal Trade Commission charges

109.    Federal and state courts across the country have recognized that the operation of a pyramid scheme—such as Young Living—constitutes fraud.  Pyramid schemes make money for those at the top of the pyramid and victimize those at the bottom who cannot find recruits. Accordingly, pyramid schemes are inherently fraudulent.  Defendant's operations are also a pyramid scheme because they are based on false promises of vast financial rewards, which are impossible to achieve for new distributors who enter at the bottom of the pyramid and who have no realistic chance of moving up the ladder.

110.    Ultimately, the distributors are financially induced by Defendant to recruit new distributors to join the sales force through materially false representations and omissions concerning the Young Living pyramid scheme.  By emphasizing recruitment over product sales, Young Living easily crosses the threshold from legitimate MLM into an illegal pyramid scheme.

111.    The rewards that distributors can achieve in this case are dependent on virtually endless recruitment into the scheme in which people are exploited and have virtually no chance to get a return on their investment, let alone achieve the high financial gains that Defendant induced these representatives to believe they would achieve.

**H.      Plaintiffs' Experiences Confirm Young Living Is a Pyramid Scheme**

      **1.      Plaintiff Lindsay Penhall**

112.    In May 2018, Plaintiff Lindsay Penhall joined Young Living as a distributor after learning about it from another Young Living distributor.

---

that the company operated an illegal pyramid scheme that deceived consumers into believing they could earn significant income as 'distributors' of its health and wellness products.").

113.    In deciding to become a Young Living distributor, Lindsay relied on Young Living's material misrepresentations concerning the financial success she would likely achieve by becoming a distributor of Defendant's essential oils.  Specifically, Lindsay believed she would earn significant income through recruiting others to become Young Living distributors and part of her downline.

114.    To join Young Living, Lindsay purchased a premium starter kit and approximately $300 worth of essential oils.  Thereafter, Lindsay began making monthly payments to Young Living in order to satisfy her PV requirement and to ensure she could receive the potential commissions of her downline.

115.    Of course, like the overwhelming majority of distributors, Lindsay found recruitment difficult, notwithstanding the fact that Lindsay expended considerable time and money in her recruitment efforts.  Indeed, Lindsay organized classes, giveaways, and other recruiting events to which she invited friends and others in an attempt to recruit new distributors.  Lindsay even constructed a display of Young Living products at the store where she worked and spoke with numerous customers about Young Living products in an effort to recruit new distributors.  Notwithstanding her efforts, Lindsay was only able to recruit two new distributors, her partner and a friend.  Unfortunately, just like Lindsay, they both lost substantial sums of money working as distributors for Young Living.

116.    Yet, Lindsay dutifully purchased product month after month even though she didn't need it and had no hope of re-selling it to someone else.  Moreover, Young Living never questioned whether Lindsay was re-selling at least 70% of her purchases.

117.    In the end, Lindsay had purchased approximately $2,150 of product, but had only "earned" commissions of approximately $300 from her downline.  Accordingly, Lindsay lost about $1,850 in Young Living's pyramid scheme, and therefore did not receive the benefit of her bargain and suffered an injury in fact.

118.    Lindsay describes her experience working as a Young Living distributor as extremely stressful.  But Lindsay's experience is hardly an aberration; rather, it is typical of the experience of most Young Living distributors.

119.    Had Young Living disclosed to Lindsay that most distributors lose money rather than earn money, Lindsay would never have become a Young Living distributor.  Similarly, had Young Living disclosed that it was an illegal pyramid scheme, Lindsay would not have become a distributor.  And, had Young Living not misrepresented the financial success Lindsay was likely to achieve and/or the "income opportunity," Lindsay would not have become a distributor.

### 2.    Plaintiff Sarah Maldonado

120.    In late 2018, Plaintiff Sarah Maldonado joined Young Living as a distributor after meeting a Young Living distributor through Facebook.

121.    In deciding to become a Young Living distributor, Sarah relied on Young Living's material misrepresentations concerning the financial success she would likely achieve by becoming a distributor of Defendant's essential oils.  Specifically, Sarah believed she would earn significant income through recruiting others to become Young Living distributors and part of her downline.

122.    To join Young Living, Sarah purchased a premium starter kit with desert mist diffuser plus a "Lemongrass Vitality" oil for a total of $179.92. Thereafter, starting in May of 2019, Sarah began making monthly payments to Young Living in order to satisfy her PV requirement and to ensure she could receive the potential commissions of her downline.  In response, one of the individuals in Sarah's upline made a public Facebook post congratulating her for making it, or almost making it, to Young Living's next "level." The implication behind the post was that Sarah was selling so much product that she was advancing, when in reality she was simply purchasing product out of her own pocket.

123.    At the time, Sarah's free time was extremely limited, as her husband had passed away in mid-November 2018—a month before she started with Young Living—and she was taking care of her children. In response, one of Sarah's upline distributors told Sarah that Young Living was her ticket to success for her kids, and to ***stop using her kids as an excuse***.

124.    Sarah's upline distributors pressured Sarah to recruit new distributors. Under pressure from her upline, Sarah organized recruiting events to which she invited friends and others in an attempt to recruit new distributors.  Additionally, when Sarah was attempting to sell essential oils to a given acquaintance, her upline distributors pressured Sarah to recruit the buyer and sign them up as a distributor by selling them a starter kit.  Even where a buyer wanted to purchase a small amount of lavender oil—which is readily available in stores— Sarah's upline distributors pressured her to convert the buyer into a distributor and to sell them starter kits containing oils that the buyers did not ask for.  Of course, like the overwhelming majority of distributors, Sarah found recruitment difficult, and notwithstanding these efforts, Sarah was not able to recruit any distributors.

125.    Yet, Sarah dutifully purchased product month after month even though she didn't need it and had no hope of re-selling it to someone else.  Moreover, Young Living never questioned whether Sarah was re-selling at least 70% of her purchases.

126.    In the end, Sarah had purchased over $1,750 of product, yet was unable to sell any product.  Accordingly, Sarah lost over $1,750 in Young Living's pyramid scheme, and therefore did not receive the benefit of her bargain and suffered an injury in fact.

127.    Sarah describes her experience working as a Young Living distributor as extremely stressful.  But Sarah's experience is hardly an aberration; rather, it is typical of the experience of most Young Living distributors.

128.    Had Young Living disclosed to Sarah that most distributors lose money rather than earn money, Sarah would never have become a Young Living distributor.  Similarly, had Young Living disclosed that it was an illegal pyramid scheme, Sarah would not have become a distributor.  And, had Young Living not misrepresented the financial success Sarah was likely to achieve and/or the "income opportunity," Sarah would not have become a distributor.

### 3.    Plaintiff Tiffanie Runnels

129.    In September 2014, Plaintiff Tiffanie Runnels joined Young Living as a distributor after learning about it from another Young Living distributor.

130.    In deciding to become a Young Living distributor, Tiffanie relied on Young Living's material misrepresentations concerning the financial success she would likely achieve by becoming a distributor of Defendant's essential oils.  Specifically, Tiffanie believed she would earn significant income through recruiting others to become Young Living distributors and part of her downline.  Indeed, she was told that if she became a successful recruiter, she

would not need to sell product to make money; rather, she would only need to purchase the monthly minimum amount of product needed to qualify. Ultimately, however, Tiffanie was only able to recruit one distributor.

131.    To join Young Living, Tiffanie purchased a starter kit, spending over $100 for the starter kit alone.  Thereafter, Tiffanie began making monthly payments to Young Living of over $100 a month in order to satisfy her PV requirement and to ensure she could receive the potential commissions of her downline.

132.    Of course, like the overwhelming majority of distributors, Tiffanie found recruitment and selling difficult, notwithstanding the fact that Tiffanie expended considerable time, money, and energy in her efforts to sell starter kits to prospective distributors in various social media groups. Notwithstanding her efforts, Tiffanie was only able to recruit one new distributor, who, just like Tiffanie, also lost substantial sums of money working as a distributor for Young Living.

133.    Yet, Tiffanie dutifully purchased product month after month. Young Living never questioned whether Tiffanie was re-selling at least 70% of her purchases.

134.    By the time Tiffanie realized she had been victimized by Young Living, she had purchased at least $1,000 of product, yet sold only perhaps $50 to $100 worth of product, and did not earn any commission.

135.    Tiffanie describes her experience working as a Young Living distributor as disappointing, given all the time, money and energy she spent in an effort to develop a successful business venture, only to end up *losing* money. But Tiffanie's experience is hardly an aberration; rather, it is typical of the experience of most Young Living distributors.

136.     Had Young Living disclosed to Tiffanie that most distributors lose money rather than earn money, Tiffanie would never have become a Young Living distributor.  Similarly, had Young Living disclosed that it was an illegal pyramid scheme, Tiffanie would not have become a distributor.  And, had Young Living not misrepresented the financial success Tiffanie was likely to achieve and/or the "income opportunity," Tiffanie would not have become a distributor.

## VI.     CLASS ACTION ALLEGATIONS

137.     Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of themselves and all others similarly situated, and as members of the Classes defined as follows:

**All residents of the United States who, within the relevant statute of limitations periods, were Young Living distributors ("Nationwide Class"); and**

**All residents of California who, within four years prior to the filing of this Complaint, were Young Living distributors ("California Subclass")**

("Nationwide Class" and "California Subclass," collectively, "Class").

138.     Excluded from the Class are: (i) Defendant, its assigns, successors, and legal representatives; (ii) any entities in which Defendant has controlling interests; (iii) federal, state, and/or local governments, including, but not limited to, their departments, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions; (iv) all persons presently in bankruptcy proceedings or who obtained a bankruptcy discharge in the last three years; and (v) any judicial officer presiding over this matter and person within the third degree of consanguinity to such judicial officer.

139.     Plaintiffs reserve the right to amend or otherwise alter the class definitions presented to the Court at the appropriate time in response to facts learned through discovery, legal arguments advanced by Defendant, or otherwise.

140.     This action is properly maintainable as a class action pursuant to Federal Rule of Civil Procedure 23 for the reasons set forth below.

141.     **Numerosity:** Members of the Class are so numerous that joinder of all members is impracticable.  Upon information and belief, the Nationwide Class consists of hundreds of thousands of Members (if not more) dispersed throughout the United States, and the California Subclass likewise consists of tens of thousands of Members (if not more) dispersed throughout the State of California.  Accordingly, it would be impracticable to join all members of the Class before the Court.

142.     **Common Questions Predominate:** There are numerous and substantial questions of law or fact common to all members of the Class that predominate over any individual issues.  Included within the common questions of law or fact are:

a.     Whether Defendant engaged in unlawful, unfair or deceptive business practices;

b.     Whether Defendant violated California Bus. & Prof. Code § 17200, *et seq.*;

c.     Whether Defendant violated Cal. Bus. & Prof. Code § 17500, *et seq.;*

d.     Whether Defendant was operating an unlawful pyramid scheme;

e.     Whether Defendant was operating an unlawful endless chain under California state law.

f.        Whether Defendant fraudulently omitted and otherwise failed to inform Plaintiffs and the Class that they were entering into an unlawful scheme where an overwhelming number of participants lose money;

k.        Whether Defendant negligently misrepresented the income opportunity and/or financial success Class Members would achieve by becoming a Young Living distributor.

l.        Whether Plaintiffs and the Class are entitled to equitable and/or injunctive relief;

m.        Whether Plaintiffs and the Class have sustained damages as a result of Defendant's unlawful conduct;

n.        The proper measure of damages sustained by Plaintiffs and Class Members; and,

o.        Whether Defendant was unjustly enriched by its unlawful conduct.

143.   **Typicality**:  Plaintiffs' claims are typical of the claims of the Class Members they seek to represent because Plaintiffs, like the Class Members, participated in Defendant's misleading and deceptive practices, and Defendant's unlawful, unfair and/or fraudulent actions concern the same business practices described herein irrespective of where they occurred or were experienced.  Plaintiffs and the Class sustained similar injuries arising out of Defendant's conduct.  Plaintiffs' and Class Members' claims arise from the same practices and course of conduct and are based on the same legal theories.

144.   **Adequacy**: Plaintiffs are adequate representatives of the Class they seek to represent because their interests do not conflict with the interests of the Class Members

Plaintiff seek to represent.  Plaintiffs will fairly and adequately protect Class Members'

interests and have retained counsel experienced and competent in the prosecution of complex

class actions.

145.   **Superiority and Substantial Benefit:** A class action is superior to other

methods for the fair and efficient adjudication of this controversy, since individual joinder of

all members of the Class is impracticable and no other group method of adjudication of all

claims asserted herein is more efficient and manageable for at least the following reasons:

a.   The claims presented in this case predominate over any questions of law or

fact, if any exist at all, affecting any individual member of the Class;

b.   Absent a Class, the members of the Class will continue to suffer damage

and Defendant's unlawful conduct will continue without remedy while

Defendant profits from and enjoys its ill-gotten gains;

c.   Given the size of individual Class Members' claims, few, if any, Class

Members could afford to or would seek legal redress individually for the

wrongs Defendant committed against them, and absent Class Members have

no substantial interest in individually controlling the prosecution of

individual actions;

d.   When the liability of Defendant has been adjudicated, claims of all members

of the Class can be administered efficiently and/or determined uniformly by

the Court; and

e.   This action presents no difficulty that would impede its management by the

Court as a class action, which is the best available means by which Plaintiffs

and Class Members can seek redress for the harm caused to them by Defendant.

146.     Because Plaintiffs seek relief for all members of the Class, the prosecution of separate actions by individual members would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendant.

147.     The prerequisites to maintaining a class action for injunctive or equitable relief pursuant to Fed. R. Civ. P. 23(b)(2) are met as Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or equitable relief with respect to the Class as a whole.

148.     Plaintiffs and Plaintiffs' counsel are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

### COUNT I
**Endless Chain Scheme**
**(California Penal Code § 327 and California Civil Code § 1689.2)**
**(*On Behalf of the California Subclass*)**

149.     Plaintiffs repeat and re-allege the allegations made throughout this Complaint as if fully set forth herein.

150.     Plaintiffs bring this claim individually and on behalf of the California Subclass.

151.     California Penal Code § 327 renders endless chain schemes illegal.  Section 1689.2 of the California Civil Code provides:

A participant in an endless chain scheme, as defined in Section 327 of the Penal Code, may rescind the contract upon which the scheme is based, and

may recover all consideration paid pursuant to the scheme, less any amounts paid or consideration provided to the participant pursuant to the scheme.

152.   Defendant is operating an endless chain scheme, as described herein.

153.   Plaintiffs and the California Subclass have suffered an injury in fact and have lost money because of Defendant's business acts, omissions, and practices.

154.   Plaintiffs and the California Subclass are entitled to recover all consideration paid under the scheme, less any amounts paid or consideration provided to the participant under the scheme.

155.   Plaintiff Penhall currently possesses two Desert Mist diffusers that she had purchased from Young Living. Plaintiff Maldonado also currently possesses a Desert Mist diffuser that she purchased from Young Living. Young Living sells a Desert Mist diffuser for $83.88 (Retail) or $63.75 (Wholesale).  Plaintiff Runnels also possesses a diffuser that she purchased from Young Living.  Plaintiffs can return the diffusers to Young Living.

156.   A violation of California Penal Code § 327 can be punishable by imprisonment for up to three years in state prison.

**COUNT II**
**Unfair and Unlawful Business Acts and Practices**
**(California Business and Professions Code § 17200, *et seq*.)**
**(*On Behalf of the California Subclass*)**

157.   Plaintiffs repeat and re-allege the allegations made throughout this Complaint as if fully set forth herein.

158.   Plaintiffs bring this claim individually and on behalf of the California Subclass.

159.   Defendant engaged in continuous illegal, unfair, and fraudulent business acts or practices, and unfair, deceptive, false and misleading advertising within the meaning of the

California Business and Professions Code § 17200, *et. seq.*  The acts or practices alleged

herein constitute a pattern of behavior, pursued as a wrongful business practice, that has

victimized and continues to victimize thousands of consumers.

160.     Under California Business and Professions Code § 17200, an "unlawful"

business practice violates California law. Defendant's business practices are illegal because

they involve the creation and promotion of an illegal pyramid scheme or "endless chain" under

California law.  Defendant is engaged in an illegal pyramid scheme or "endless chain" as

defined under California Penal Code § 327.  Defendant utilizes this illegal pyramid scheme

with the intent, directly or indirectly to dispose of property, in Young Living products, and to

convince distributors to recruit others to do the same.

161.     Under California Business and Professions Code § 17200, an "unfair" business

practice includes a practice that offends an established public policy, or that is immoral,

unethical, oppressive, unscrupulous or substantially injurious to consumers.  Defendant's

promotion and operation of an illegal pyramid scheme is unethical, oppressive, and

unscrupulous in that Defendant is duping consumers out of vast sums of money through the

illegal pyramid scheme.

162.     Under California Business and Professions Code § 17200, a "fraudulent"

business practice is likely to deceive the public.  Defendant's business practice is fraudulent in

that Defendant has deceived and continued to deceive the public by misrepresenting its

business.  Defendant has made numerous misrepresentations and material omissions regarding

the income a distributor can realize and the financial success a distributor can achieve, and

Defendant has failed to inform consumers that they are operating an illegal pyramid scheme

where nearly all distributors will lose money rather than make money.  Plaintiffs and the

California Subclass have relied on and continue to rely on Defendant's misrepresentations and

omissions to their detriment.

163.    Because of these unlawful acts, Defendant has reaped and continues to reap

unfair benefits and illegal profits at the expense of Plaintiffs and the California Subclass.

Defendant should be made to disgorge these ill-gotten gains and return to Plaintiffs and the

California Subclass the wrongfully taken revenue.

164.    Defendant's unlawful, unfair, and fraudulent acts and omissions will not cease

without injunctive relief being provided.  Under California Business and Professions Code §

17203, Plaintiffs seek equitable and injunctive relief to stop Defendant's misconduct, as

complained of herein, including, but not limited to, an order declaring such misconduct to be

unlawful, unfair, fraudulent, and/or deceptive, and enjoining Defendant from undertaking any

further unfair, unlawful, fraudulent, and/or deceptive acts or omissions relate to operating the

illegal pyramid scheme.

## COUNT III
### Deceptive Advertising Practices
**(California Business and Professions Code § 17500, *et seq*.)**
**(*On Behalf of the California Subclass*)**

165.    Plaintiffs repeat and re-allege the allegations made throughout this Complaint as

if fully set forth herein.

166.    Plaintiffs bring this claim individually and on behalf of the California Subclass.

167.    California Business & Professions Code § 17500 prohibits "unfair, deceptive,

untrue or misleading advertising[.]"

168.    Defendant's business acts, false advertisements and materially misleading omissions constitute unfair trade practices and false advertising, in violation of the California Business and Professions Code § 17500, *et. seq*.

169.    Defendant engaged in and continues to engage in false, unfair, and misleading business practices consisting of false advertising and materially misleading omissions likely to deceive the public and include, but are not limited to:

       a.    Defendant failing to disclose to Class Members that they were entering into an illegal pyramid scheme;

       b.    Defendant misrepresenting the income opportunity and/or financial success a Class Member would achieve; and

       c.    Defendant failing to disclose to Class Members that the vast majority would lose money rather than earn money.

170.    Defendant's marketing and promotion of the illegal pyramid scheme constitutes misleading, unfair, and fraudulent advertising in connection with its false advertising to induce consumers to purchase products and join the illegal pyramid scheme.  Defendant knew or should have known, in exercising reasonable care, that the statements it was making were untrue or misleading and deceived members of the public.  Defendant knew or should have known, in exercising reasonable care, that distributors, including Plaintiffs, would rely, and did rely, on Defendant's misrepresentations and omissions.

171.    Because of Defendant's untrue and misleading representations, Defendant wrongfully acquired money from Plaintiffs and the California Subclass to which it was not entitled.  Accordingly, the Court should order Defendant to disgorge, for the benefit of

Plaintiffs and the Class, its profits and compensation and/or make restitution to Plaintiffs and the Class.

172.    Under California Business and Professions Code § 17535, Plaintiffs and the California Subclass seek a judicial order directing Defendant to cease and desist with all false advertising related to Defendant's illegal pyramid scheme and such other injunctive relief as the Court finds just and appropriate.

Pursuant to Civil Code § 3287(a), Plaintiffs and the California Subclass are further entitled to pre-judgment interest as a direct and proximate result of Defendant's unfair and fraudulent business conduct.  The amount on which interest is to be calculated is a sum certain and capable of calculation, and Plaintiffs and the California Subclass are entitled to interest in an amount according to proof.

## COUNT IV
### Fraudulent Omission
### (Cal. Civ. Code §§ 1709-1710 and California Common Law)
### *(On Behalf of the California Subclass)*

173.    Plaintiffs repeat and re-allege the allegations made throughout this Complaint as if fully set forth herein.

174.    Plaintiffs bring this claim individually and on behalf of the California Subclass.

175.    Plaintiffs bring this claim pursuant to California Civil Code §§ 1709-1710, et seq., and pursuant to California common law.

176.    This claim is based on fraudulent omissions concerning Defendant's illegal pyramid scheme.  Defendant actively concealed material facts, in whole or in part, with the intent to induce Plaintiffs and the Class to join Defendant's illegal pyramid scheme.

177.    As discussed herein, and among other things, Defendant failed to disclose to Class Members that they were entering into an illegal pyramid scheme, and that the vast majority of Class Members would lose money rather than earn money.  Moreover, Defendant failed to adequately disclose its appalling—and certainly material—income statistics to Class Members.

178.    The false and misleading omissions were made with knowledge of their falsehood.

179.    Defendant knew the omitted information was material and was information Class Members would have wanted to know in making a decision to become a Young Living distributor.

180.    In addition, Defendant could easily have disclosed the omitted information through the many different channels Defendant uses to disseminate information, as described herein, including on the various pages of Defendant's website through which consumers enroll to become distributors, as well as on its distributor application form.

181.    Nonetheless, Defendant continued to encourage consumers to become distributors of the illegal pyramid scheme without disclosing and actively concealing this material information.

182.    The false and misleading omissions were made by Defendant, upon which Plaintiffs and Class Members reasonably and justifiably relied, and were intended to induce and actually induced Plaintiffs and Class Members to become Young Living distributors.

183.    Plaintiffs and the Class were unaware of these omitted material facts and would not have become Young Living distributors had they known them.

184.    Plaintiffs and the Class suffered injuries that were proximately caused by Defendant's active concealments and omissions of material facts.

**COUNT V**
**Negligent Misrepresentation**
**(Cal. Civ. Code §§ 1709-1710 and California Common Law)**
***(On Behalf of the California Subclass)***

185.    Plaintiffs repeat and re-allege the allegations made throughout this Complaint as if fully set forth herein.

186.    Plaintiffs bring this claim individually and on behalf of the California Subclass.

187.    Plaintiffs bring this claim pursuant to California Civil Code §§ 1709-1710, et seq. and pursuant to California common law.

188.    As described in more detail herein, Defendant negligently misrepresented material facts concerning the income opportunity and/or financial success that a Class Member would achieve by becoming a Young Living distributor, and/or that Young Living was a legitimate—and lawful—multilevel marketing company as opposed to an illegal pyramid scheme.

189.    Plaintiffs and Class Members were unaware of the falsity of Defendant's misrepresentations and, as a result, justifiably relied on them when making the decision to become Young Living distributors.

190.    Defendant knew or should have known that Plaintiffs and Class Members would not have realized the truth of Defendant's negligent misrepresentations.

191.    Defendant was in a superior position than Plaintiffs and the Class such that reliance by Plaintiffs and the Class on Defendant's misrepresentations was justified.

Defendant possessed the skills and expertise to know the type of information that would influence a consumer's decision to become a distributor.

**COUNT VI**
**Unjust Enrichment**
***(On Behalf of the Nationwide Class and California Subclass)***

192.    Plaintiffs repeat and re-allege the allegations of the preceding paragraphs as if fully set forth herein.

193.    Plaintiffs bring this claim individually and on behalf of the Nationwide Class and California Subclass.

194.    By becoming a distributor, Plaintiffs and the Class conferred a benefit on Defendant in the form of monetary payments made to Defendant.

195.    Defendant had knowledge of such benefits.

196.    Defendant appreciated the benefit because, were consumers not to become distributors, Defendant would not generate substantial revenues and profits.

197.    Defendant's acceptance and retention of the benefit is inequitable and unjust because the benefit was obtained by Defendant's fraudulent conduct.

198.    Equity cannot in good conscience permit Defendant to be economically enriched for such actions at the expense of Plaintiffs and the Class, and therefore restitution and/or disgorgement of such economic enrichment is required.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the putative Class pray for judgment against Defendant as follows:

1. For an order certifying the Nationwide Class and the California Subclass under Rule 23 of the Federal Rules of Civil Procedure; naming Plaintiffs as representatives of the Nationwide Class and California Subclass; and naming Plaintiffs' attorneys as Class Counsel to represent the Nationwide Class and California Subclass;

2. A judgment against Defendant;

3. For an order declaring that Defendant's conduct violates the statutes and laws referenced herein;

4. Rescission of the agreements upon which the scheme is based, and recovery of all consideration paid pursuant to the scheme, less any amounts paid or consideration provided to the participant pursuant to the scheme;

5. For an order awarding, as appropriate, compensatory and monetary damages, restitution or disgorgement to Plaintiffs and the Class for all causes of action;

6. Temporary and permanent injunctive relief enjoining Defendant from further unfair, unlawful, fraudulent and/or deceptive acts, including but not limited to supporting the pyramid scheme;

7. The costs of investigation and litigation reasonably incurred, as well as attorneys' fees;

8. For such other damages, relief and pre- and post-judgment interest as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and the proposed Class, hereby demand a trial by jury as to all matters so triable.

DATED this 30th day of August, 2021.

/s/ *Cody R. Padgett*

CAPSTONE LAW APC
Tarek H. Zohdy (*pro hac vice*)
Cody R. Padgett (*pro hac vice*)

MOON LAW APC
Christopher D. Moon (*pro hac vice*)
Kevin O. Moon (*pro hac vice*)

TOMCHAK SKOLOUT
Nicole A. Skolout (10223)

*Attorneys for Plaintiffs Lindsay Penhall, Sarah Maldonado, and Tiffanie Runnels*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 30th of August 2021, I filed the foregoing **SECOND**

**AMENDED CLASS ACTION COMPLAINT** via the Court's ECF/CM filing system, which

electronically served all counsel of record.

/s/  *Cody R. Padgett*